544 A.2d 1345

**Richard DiSALLE and Joan DiSalle, His Wife,**

v.

**P.G. PUBLISHING COMPANY, t/a The Pittsburgh Post–Gazette, a Corporation, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 30, 1987.

Filed June 15, 1988.

Reargument Denied Aug. 5, 1988.

Frederick N. Egler, Pittsburgh, for appellant.

Daniel M. Berger, Pittsburgh, for appellees.

Before CIRILLO, President Judge, and JOHNSON and MONTGOMERY, JJ.

CIRILLO, President Judge:

The libel action underlying this appeal stems from the publication of an article in the September 10, 1979 edition of the appellant's newspaper, the Pittsburgh Post–Gazette. *See* Appendix. The suit was tried by the Court of Common Pleas of Washington County sitting by agreement of the parties and counsel in neighboring Westmoreland County. The Honorable Gilfert M. Mihalich, President Judge of Westmoreland County, presided by special appointment. Following a lengthy trial, the jury returned a general verdict in favor of the appellees, Richard DiSalle and Joan DiSalle, his wife, in the combined amount of $210,000.00 compensatory and $2,000,000.00 punitive damages. The Post–Gazette filed timely motions for post-trial relief, which the trial court denied after a thorough and well reasoned discussion of the case. Here the paper seeks, in the alternative, a judgment *non obstante veredicto*, a new trial, or a remittitur of damages.

The appellant urges upon us three categories of error committed by the trial court which entitle it to the relief sought: (1) error concerning the constitutional "actual malice" standard to be applied; (2) error concerning the award of compensatory damages; and (3) error concerning the award of punitive damages.[1] We affirm.

The article in question appeared in the "City/Area" section of the Post–Gazette, a paper with a daily readership of

---

1. The appellant's Statement of the Questions Involved frames the issues as follows:

 I. Whether the trial court erred in failing to grant judgment notwithstanding the verdict under the constitutional "actual malice" standard enunciated in *Time, Inc. v. Pape?*

 II. Whether the trial court erred in failing to instruct the jury on the "actual malice" issue under the *Time, Inc. v. Pape* standard?

 III. Whether the trial court erred in permitting the jury to assess damages for present and future harm?

 IV. Whether the trial court erred in permitting the jury to assess punitive damages?

 V. Whether the trial court erred in failing to instruct the jury as to limitations on the punitive damage award required under Pennsylvania Law and the First Amendment.

 VI. Whether the trial court erred in failing to set aside the punitive damage verdict.

nearly 200,000, under the title "Feud Heats in Family's Battle for $8 Million Inheritance." The matter was first brought to the attention of the Post–Gazette staff when Robert Ciaffoni called the assistant city editor, Dave Warner, to inform him of a dispute then embroiling his family over the will of his father, Paul Ciaffoni, who had died in 1974. Mr. Warner assigned a reporter, Tom Porter, to investigate the potential for a story.

Mr. Porter's first stop, and ultimately his principal source of information in this investigation, was Robert Ciaffoni. From Ciaffoni, Porter learned that the family dispute focused on the authenticity of the decedent's 1968 will, which had been admitted to probate in 1974. He also learned that Ciaffoni, as well as other family members, had taken the contest to the courts of Washington County by filing an appeal from probate, that the matter had been tried before the Honorable Earl S. Keim, specially appointed to preside over the contest, and that Judge Keim had upheld the validity of the probated document six months before Ciaffoni contacted the newspaper, and nearly a year before the article was published.

In this context, Richard DiSalle, a local attorney who had served for eight years on the trial bench of Washington County, and who later filled a vacancy on the commonwealth court bench by appointment of Governor Shapp, was alleged to have conspired with Ciaffoni's sister, Elizabeth Cowden, to produce the fraudulent will. After reviewing an early draft of Porter's story, Warner noted what he considered to be a hole in that it did not give any explanation why DiSalle would involve himself in such a conspiracy. In an attempt to address this concern, Porter included in later drafts material from a deposition taken of Robert Ciaffoni in anticipation of the will contest, wherein Ciaffoni was asked about prior statements he had made concerning the relationship between DiSalle and Mrs. Cowden. In the final article, this material, by then reduced to a single quote, left the reader with the impression that the reason for DiSalle's involvement in the conspiracy was a meretri-

cious relationship with Mrs. Cowden. This issue was never raised during the trial itself, nor was the deposition introduced into evidence.

These two allegations made by Robert Ciaffoni, that is, that Richard DiSalle participated in a fraudulent act and that he had an illicit affair with a co-conspirator, contained as they were in an article that did not principally focus on the will contest which had occurred in Washington County much earlier, form the basis of this libel action.

I

## ACTUAL MALICE

The Post–Gazette first challenges the definition of actual malice applied by the trial court, asserting that a different standard should have been used under the facts of this case. Because the paper does not also allege that the evidence was insufficient to prove actual malice as the trial court defined it, we are faced with the single question whether the trial court committed an error of law in defining actual malice as it did. Before reaching this issue, however, we must first determine the propriety of applying the actual malice standard at all.

### A. Applicability of Actual Malice

■ The requirement of proof of actual malice in certain defamation actions, discussed more extensively *infra*, was first introduced into the constitutional arena, where the tension between the freedoms of the First Amendment and the constraints of state defamation law is manifest, by the Supreme Court in the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There, the Court cleared the ground and laid the cornerstone of this coliseum for the stated purpose of more effectively limiting "a state's power to award damages for libel in actions brought by *public officials* against critics of their *official conduct*." *Id.* at 283, 84 S.Ct. at 727 (emphasis added).

At the time the article in question was being researched and published, Richard DiSalle was sitting on the Commonwealth Court of Pennsylvania by appointment and was campaigning for a full term on that court. Thus, his status as a public official cannot be disputed. However, the alleged misconduct attributed to DiSalle occurred in the late 1960's, when he was a private attorney, and approximately ten years before his appointment to a vacancy on the Commonwealth Court. At first blush, then, it appears that only one of the two requirements of the *New York Times* standard has been met, and proof of actual malice should not have been required.

However, as is often the case, in the years which followed the Supreme Court's decision in *New York Times*, factual scenarios arose which tested the high court's statement of the rule. In *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the Supreme Court reversed a Louisiana Supreme Court decision which refused to apply the *New York Times* rule in a prosecution for criminal defamation. The state court reasoned that the expressions at issue did not fall within the purview of criticism of official conduct when the attack was on the personal integrity of eight state trial judges and not on the way any one of them conducted his court when in session.

Justice Brennan, in his opinion for the court, found this reasoning defective:

> The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.

*Garrison*, 379 U.S. at 77, 85 S.Ct. at 217 (footnote omitted).

In *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971), the Supreme Court was asked to revisit the question of what constitutes "official conduct" in

determining when the *New York Times* rule is to be applied. There, the plaintiff in a civil libel action sought recovery for a statement made during the course of a political campaign that the candidate was a former small-time bootlegger. The trial court recognized that the plaintiff's candidacy for public office made him a public figure, but left it to the jury to determine whether the expression attacked official conduct rather than private conduct. The Supreme Court reversed, finding that the broadening of official conduct to that conduct which reflects on an official's fitness for office applies with special force to candidates. *Roy*, 401 U.S. at 274, 91 S.Ct. at 626.

The court went on to note that,

"[i]ndeed, whatever utility the 'official conduct' concept may retain with regard to occupants of public office ... it is clearly of little applicability in the context of an election campaign. The principal activity of a candidate in our political system, his 'office', so to speak, consists in putting before the voters every conceivable aspect of his public and private life that he thinks may lead the electorate to gain a good impression of him.... And the candidate who vaunts his spotless record and sterling integrity cannot convincingly cry 'Foul!' when an opponent or an industrious reporter attempts to demonstrate the contrary. Any test adequate to safeguard First Amendment guarantees in this area must go far beyond the customary meaning of the phrase 'official conduct.'"

*Id.*

Judge DiSalle, at the time the Post–Gazette article was published, was the holder of a position in the public trust and a candidate to continue in that role. This factual situation was presented to the Supreme Court in *Ocala Star–Banner Co. v. Damron*, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971), decided on the same day as *Roy*. In reasserting the position taken in *Roy*, the court stated "that a charge of criminal conduct against an official or a candidate, no matter how remote in time or place, is always 'relevant to his fitness for office' for purposes of applying

the New York Times rule of knowing falsehood or reckless disregard of the truth." *Ocala Star–Banner Co.*, 401 U.S. at 300, 91 S.Ct. at 632.

Judge DiSalle's action in libel focused on two statements in the Post–Gazette article, the first asserting that he was a co-conspirator in fraud, and the second attributing his participation in that fraud to an illicit affair with his co-conspirator. Fraud, of course, is a crime and therefore falls squarely within the above-stated rule. Participation in a meretricious affair, while not strictly criminal, does, under the facts of this case, impute an improper motivation, and therefore is relevant to Judge DiSalle's fitness for office. Accordingly, we conclude that Richard DiSalle was a public official at the time the article was published and that the offending expressions contained thereon related to official conduct. *Cf. McLaughlin v. Philadelphia Newspapers, Inc.*, 465 Pa. 104, 348 A.2d 376 (1975) (press access to confidential records of a disciplinary proceeding brought against a private lawyer, now in public office, may be limited in spite of the public's interest in the qualifications of its servants; court distinguished the facts before it from cases like those relied upon here).

## B. Actual Malice

It being clear that the DiSalles cannot recover in defamation absent clear and convincing evidence that the Post–Gazette's allegedly defamatory article was published with actual malice, we must now determine what that term means. At its genesis, the Supreme Court described the publication of material with actual malice as publication "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–280, 84 S.Ct. at 726. As was true with the meaning of "official conduct" discussed above, the full definition of "actual malice" has awaited case-by-case development. Clearly the first part of the definition, that the information was published with "knowledge that it was false," does not present a difficulty, for one either knows or does not know that something is not true. It is the concept

of reckless disregard which "cannot be fully encompassed in one infallible definition." *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

In *Garrison,* the Supreme Court equated reckless disregard with a "high degree of awareness of ... probable falsity." *Garrison,* 379 U.S. at 74, 85 S.Ct. at 216. Justice Harlan, in his plurality opinion in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), noted that "[i]nvestigating failures alone [have been] held insufficient to satisfy this standard." *Id.* at 153–154, 87 S.Ct. at 1991 (plurality opinion). The Court in *St. Amant, supra,* noted more expansively that

> reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325.

It is clear, then, that in its development the establishment of actual malice has never strayed far from the question of falsity, and that, for a plaintiff to prevail under this standard, it must be shown that the defendant was certain of that falsity or came close to willfully blinding itself to it. As the Supreme Court noted in *Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), "there is a significant difference between proof of actual malice and mere proof of falsity." *Id.* at 511, 104 S.Ct. at 1965 (footnote omitted). Recognizing that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive,'" *New York Times,* 376 U.S. at 271–272, 84 S.Ct. at 721 (citation omitted), the Court promulgated the actual malice standard to define the proper accommodation be-

tween the law of defamation and the freedoms of speech and press.

The allocation of this burden to the plaintiff creates the "breathing space" needed to avoid self-censorship by greatly expanding the zone of protected speech. However, the fact that the Supreme Court created a "fault" standard instead of declaring any recovery for defamation unconstitutional "makes irresistible the inference that a significant portion of this speech is beyond the constitutional pale. This observation is almost tautologically true with regard to libels published with 'actual malice.'" *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 783, 106 S.Ct. 1558, 1567, 89 L.Ed.2d 783 (1986) (Stevens, J., dissenting) (footnote omitted).

Instantly, the trial court instructed the jury on the issue of actual malice in the following manner:

Actual malice means that the Defendant newspaper knew that the defamatory statement was false when it published it or published the defamatory statements with reckless disregard of whether they were false or true. This means that the evidence must establish by clear and convincing evidence that the defamatory statement or that any defamatory statement was published with the knowledge that it was false or the entertainment of serious doubt as to the truth of the statement. Negligence, carelessness, bad judgment or inaccuracy in the preparation of the article is insufficient to prove actual malice. The mere failure to investigate does not establish reckless disregard, nor does mere negligence, negligent acts constitute actual malice. The reckless conduct which constitutes recklessness or a reckless disregard is not measured by whether a reasonable prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the Defendant, in fact, entertained serious doubt as to the truth of the publication. Publications with such doubt show reckless disregard to the truth or falsity, and this demonstrates actual malice.

R.R. at 1735a–1736a. This charge clearly states the rule as we have developed it above.

The charge continued:

Actual malice has been interpreted as an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. If you find from the evidence that the Defendant newspaper made such an extreme departure, then you may find in considering this evidence that it acted with actual malice.

R.R. at 1736a. This interpretation of actual malice was rendered in *Brophy v. Philadelphia Newspapers, Inc.*, 281 Pa.Super. 588, 596, 422 A.2d 625, 629 (1980) and relied upon Justice Harlan's plurality opinion in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967) (joined by three other justices). Chief Justice Warren, in a separate opinion, criticized the creation of a standard based on "highly unreasonable conduct" as being a departure from *New York Times* and too uncertain to aid in the effectuation of its purpose. *Curtis Publishing*, 388 U.S. at 163, 87 S.Ct. at 1995 (Warren, C.J., concurring in the result). Given the virtual absence of subsequent cases applying this standard, its continued viability is suspect. However, we need not decide whether it was error to so instruct the jury because the appellant does not challenge this aspect of the court's charge.

## C. Time, Inc. v. Pape

The Post–Gazette, however, urges that while this definition of actual malice is correct for the typical defamation case, it ignores certain salient facts in this case which should have put the trial court on a different path away from *New York Times* in search of the proper definition of actual malice to be applied. In support of this assertion the appellant relies heavily on *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 663, 28 L.Ed.2d 45 (1971).

*Pape* involved an article published in Time Magazine quoting parts of the then recently released fifth volume of the United States Commission on Civil Rights Report for

1961. This volume, entitled "Justice," focused on evidence of police brutality gathered by the Commission staff from around the country, and, as one item, noted a complaint filed by James Monroe, a citizen of Chicago, against several police officers for violations under the Federal Civil Rights Acts. The Report went on to describe the substance of that complaint. Time, in reporting on the publication of "Justice," commented specifically on the section relating to Monroe and quoted extensively from the Report's summary of the allegations contained in Monroe's complaint. However, the article failed to indicate in any way that the charges being described were made by Monroe and were not the independent findings of the Commission. Detective Pape, one of the officers named in Monroe's complaint, sued Time for libel.

When trial was finally reached, and after all the evidence was in, the District Court granted Time's motion for a directed verdict. The Court of Appeals reversed, holding that it was a jury question whether Time's failure to attribute the charges against Pape to Monroe rather than the Commission showed actual malice. The Supreme Court reversed the Court of Appeals, holding that the directed verdict was properly entered. In supporting this result, the Court repeatedly emphasized that Time was not reporting on the historical events described in "Justice," but, instead, was reporting on "Justice" itself. Based on this distinction, the Court criticized the lower court's analysis of the question of malice [2] as the kind which "may be adequate when the alleged libel purports to be an eyewitness or other direct account of events that speak for themselves," *Pape,* 401 U.S. at 285, 91 S.Ct. at 637, explaining that:

**2.** According to the Supreme Court:
> The Court of Appeals concluded that it was obvious that the omission of the word "allegation" or some equivalent was a "falsification" of the Report. Since the omission was admittedly conscious and deliberate, the only remaining question in the court's view was whether there had been "malice" in the sense of an "intent to inflict harm through falsehood." Such an intent, the court thought, might reasonably be inferred from the very act of deliberate omission, and the issue of malice was consequently one for the jury.

*Pape,* 401 U.S. at 285, 91 S.Ct. at 637.

A vast amount of what is published in the daily and periodical press purports to be descriptive of what somebody *said* rather than of what somebody *did*. Indeed, perhaps the largest share of news concerning the doings of government appears in the form of accounts of reports, speeches, press conferences, and the like. The question of the "truth" of such an indirect newspaper report presents rather complicated problems.

*Id.* at 285–286, 91 S.Ct. at 637 (emphasis in original).

The Post–Gazette interprets this language to mean that the Supreme Court equates conventional libel cases with eyewitness or direct accounts, and that, in the case of indirect newspaper reports, the Constitution requires the application of a different actual malice standard. In stating this surrogate standard, the Post–Gazette notes that the *Pape* Court never considered Time's state of mind with respect to the truth or falsity of Monroe's allegations; rather the Court concerned itself with the magazine's understanding of the Commission Report. The Post–Gazette concludes that "[t]he Supreme Court made very clear that where the publication consists of an 'indirect newspaper report' of statements made by a third-party source, the publisher's knowledge of the truth or falsity of the actual facts is not an issue in the 'actual malice' determination." Brief for Appellant at 18.

The proper explanation for the *Pape* Court's focus on Time's understanding of the Commission's Report, rather than the substance of Monroe's allegations, is easily found in the nature of the case before it, and far removed from the creation of a hybrid definition of actual malice. Before discussing the law to be applied, the Court noted that the case before it differed in a number of respects from the conventional libel case. The distinction relevant to the present discussion concerned the source of the alleged damage to reputation, the Court observing that it "was not that arising from mere publication, but rather that resulting from attribution of the Monroe accusations to an authoritative official source." *Pape*, 401 U.S. at 285, 91 S.Ct. at

637. Thus, the Court failed to discuss Time's understanding of the truth or falsity of the Monroe accusations for the simple reason that that issue was not before it. The issue was whether Time had defamed Pape with actual malice when its article suggested that the United States Commission on Civil Rights was the party accusing him of the abuses contained in the Monroe complaint rather than Monroe, as the complainant, making allegations of abuse.[3]

It was in this context, then, that the Court explained its earlier statement concerning the difficulties of determining "truth" in indirect newspaper reports:

> In light of the totality of what was said in Justice, we cannot agree that when Time failed to state that the Commission in reporting the Monroe incident has technically confined itself to the allegations of a complaint, Time engaged in a "falsification" sufficient in itself to sustain a jury finding of "actual malice."
>
> \* \* \* \* \* \*
>
> Time's omission of the word "alleged" amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under New York Times.

*Id.* at 289–290, 91 S.Ct. at 639. Because Pape shaped his theory on appeal around the allegation that Time defamed him by reporting that the Civil Rights Commission was accusing him of civil rights violations,[4] it was Time's subjec-

---

**3.** That the Post–Gazette's interpretation of *Pape* did not incorporate this pivotal point is manifest in its brief, at page 21, where it asserts that "the *source* of defamatory allegations in *Time, Inc. v. Pape,* was not the Civil Rights Commission Report, but Monroe's complaint filed in the civil rights action." (emphasis in original).

**4.** For a particularly thoughtful analysis of the effect of *New York Times,* decided while *Pape* was still in the lower courts, on the manner in which Detective Pape sought to assert his claim, see Sowle, *Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report,* 54 N.Y.U.L.Rev. 469, 502–508 (1979). According to Professor Sowle, the advent of the burden of proving actual malice caused Pape to abandon his allegation that Time defamed him

tive awareness of the truth or falsity of this fact which was the focus of the Court's actual malice analysis. The Court found Time's interpretation, that "Justice" was making the accusation, rational in light of the document's ambiguities and concluded that the evidence was insufficient to establish publication with knowing or reckless disregard of the truth.

From this language, the Post–Gazette attempts to herald the birth of a new definition of actual malice incorporating the concept of rational interpretation into all indirect reporting cases, including the instant case, in lieu of the publisher's subjective awareness of probable falsity of the underlying facts. No such sweeping effect can be attributed to *Pape*. There, the defamation complained of was in the underlying facts and was unrelated to the report upon which the publication was based. The Post–Gazette concedes that the defamation in the instant case concerned the statements that Richard DiSalle was a co-conspirator in a fraud and that he was involved in a meretricious affair. Nowhere is it contended that the defamatory injury stemmed from the newspaper's attribution of the accusations to Robert Ciaffoni or to any other source.

Even without the distinction between *Pape* and this case, however, we are not persuaded that the language of *Pape* redefines actual malice under its own facts. In *Dickey v. CBS, Inc.*, 583 F.2d 1221 (3rd Cir.1973), the Third Circuit Court of Appeals was confronted with an argument similar to the one presented here. There, the appellant claimed that *Pape* stood for the proposition that cases "involving false statements by a third party which [have] been published by the press, are entitled to a unique constitutional analysis." *Id.* at 1226. After reviewing the language from *Pape* which we considered above, the court concluded that "the Supreme Court's purpose in stating that Time was

by charging him with the civil rights abuses because proving that Time published with knowing or reckless inaccuracy promised to be a formidable task. By changing the theory to one of attribution of the charge to the Civil Rights Commission, Pape sought what apparently was perceived to be a lighter burden.

quoting from a third party appears to have been merely to emphasize the difficulty in accurately interpreting and communicating a third party's meaning without quoting a third party's statement in its entirety." *Id.* In the form of a more concise statement as to the effect of *Pape* on the jurisprudence of defamation and actual malice, the court in *McBride v. Merrell Dow & Pharmaceuticals, Inc.*, 800 F.2d 1208 (D.C.Cir.1986) noted:

> That a statement *might* have been made without actual malice does not demonstrate that it was in fact so made. Ambiguity of a statement's subject matter may be probative evidence negating a finding of actual malice, *see Time, Inc. v. Pape*, 401 U.S. 279, 290, ... [91 S.Ct. 633, 639] but it does not call forth a conclusive presumption precluding resort to actual evidence of the defendant's state of mind.

*Id.* at 1212 (emphasis in original).

We agree. Surely if the Supreme Court in *Pape* had intended to announce a unique constitutional analysis for indirect reporting cases, it would have said so. Instead, it applied the definition of actual malice we stated above, and determined that, "[a]pplying *this standard* to Time's interpretation of the Commission Report, it can hardly be said that Time acted in reckless disregard of the truth." *Pape*, 401 U.S. at 292, 91 S.Ct. at 640 (emphasis added); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 459 n. 4, 96 S.Ct. 958, 967, 47 L.Ed.2d 154 (1976) ("Petitioner is incorrect in arguing that a rational interpretation of an ambiguous document is constitutionally protected under ... *Pape....* There we were applying the New York Times standard....").

### D. Neutral Reportage

The real thrust of the protection sought by the Post–Gazette, therefore, is not contained in *Pape* for, as we have demonstrated, that decision does not stand for the proposition asserted [5] and is inapposite to the facts of the

---

**5.** Although some early commentators made the same mistake as the Post–Gazette, *see, e.g.,* Eaton, *The American Law of Defamation Through* Gertz v. Robert Welch, Inc., *and Beyond: An Analytical*

instant case. However, by also relying on the Court of Appeals for the Second Circuit's decision in *Edwards v. National Audubon Society*, 556 F.2d 113 (2nd Cir.) *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), the Post–Gazette provides us with a far more apposite, albeit not binding, *see Cianfrani v. Johns–Manville Corp.*, 334 Pa.Super. 1, 6, 482 A.2d 1049, 1051 (1984) (ruling of federal intermediate appellate panel not binding on Pennsylvania courts), precedent for the claim that it is protected by a constitutional privilege of neutral reportage.[6]

In *Edwards*, the New York Times reported on a charge contained in the Foreword to the National Audubon Society's publication, "American Birds." There, the editor stated that scientists who claimed the use of the insecticide DDT was not adversely affecting the bird populations had been "paid to lie." A reporter for the Times procured the names of these scientists and published the story. The scientists sued for defamation.

The Court of Appeals for the Second Circuit, in reversing a judgment for the plaintiffs, reasoned that:

> [W]hen a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of those charges, regardless of the reporter's private views regarding their validity. *See Time, Inc. v. Pape*, 401 U.S. 279, ... [91 S.Ct. 633]; *Medina v. Time, Inc.*, 439 F.2d 1129 (1st Cir.1971). What is newsworthy about such accusations is that they were made. We do not believe that the press may be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth.

*Primer*, 61 Va.L.Rev. 1349, 1362 n. 46 (1976) and *W. Prosser, Handbook of Law of Torts*, 832 and n. 64a (4th ed. 1971), later analysts exposed the error. *See* Sowle, *Defamation and the First Amendment*, *supra* note 4, at 502.

6. "Neutral reportage" is the moniker assigned to the rule by the *Edwards* court, 556 F.2d at 120, and is the one we will use. It should be noted, however, that the rule has also been referred to as the privilege of accurate republication and the privilege of fair report.

*Edwards,* 556 F.2d at 120. In support of this rule, the court went on to point out that "[t]he public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them." *Id.*

In spite of its conclusion that the New York Times could not be held liable for defamation due to the protection afforded by its newly created constitutional privilege of neutral reportage, the court inexplicably went on to point out that, "absent the special protection afforded to neutral reportage, *see Time, Inc. v. Pape, supra,*[7] the evidence adduced at trial was [nonetheless] manifestly insufficient to demonstrate 'actual malice' on the part of the Times," *id.,* and to conclude that "even if the Times were required to assume direct responsibility for the accusations, it could not, consistent with *New York Times Co. v. Sullivan, supra,* be found liable for defamation." *Id.* at 121 (footnote omitted). Having so reasoned, the court undercut the importance of its new theory of neutral reportage by rendering it dictum.

However, the Post–Gazette has relied exclusively on this theoretical defense in its appeal and we, therefore, will give it further analysis. Having reached this point, we should note how the appellant's argument limits the issue before us. The *Edwards* expression of the neutral reportage rule essentially seeks to credential the common law privilege of fair report [8] with constitutional stature, with some telling differences not relevant here. The Post–Gazette has been careful to distance its argument from the common law privilege and does not challenge the trial court's charge on

---

**7.** As we have already pointed out, this reliance on *Pape* for the creation of the special privilege is inappropriate.

**8.** The Restatement (Second) of Torts § 611 (1977) defines this privilege as follows:

The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.

the common law rule of fair report,[9] nor does it challenge the jury's finding that the privilege had been abused. Therefore, we need not consider the issue of the common law privilege.

We also reassert that the Post–Gazette has not challenged the trial court's charge on actual malice as defined by *New York Times v. Sullivan, supra,* and its progeny, nor does it challenge the sufficiency of the evidence to support a finding of actual malice in this case. In fact, as will be developed *infra,* the need for the neutral reportage doctrine is manifest only in those circumstances where the defendant is not already protected by the constitutional requirement for proof of actual malice. Therefore, by relying solely on the neutral reportage doctrine, the Post–Gazette is implicitly admitting the existence of actual malice. The only error alleged is that the trial court failed to consider the neutral reportage doctrine in charging the jury and in deciding the motion for judgment n.o.v. Therefore, the availability of this doctrine to the Post–Gazette is the only remaining liability issue we will address.[10]

9. In footnote five of its brief, the Post–Gazette notes that the trial court charged the jury on the question of the common law privilege of fair report (the footnote refers to the common law rule as one of "fair comment", apparently relying on the trial judge's use of that term in his charge; however, "fair comment" refers to the privilege of free expression of opinion on matters of public concern, *see* Restatement (Second) of Torts § 566 comment a (1977)—the correct name is "fair report"). Brief for Appellant at 28 n. 5. It does not allege that the giving of this charge was error, or that the substance of the charge given was incorrect. Rather, it asserts "that the trial court may well have viewed the First Amendment protection afforded under *Time, Inc. v. Pape,* as roughly equivalent to the common law 'fair comment' privilege ... [and therefore] that an instruction on *Time, Inc. v. Pape,* was unnecessary since the jury was charged on the common law privilege." *Id.*

The balance of the footnote attempts to demonstrate that the two privileges are different, most notably in the scope of the protections they respectively afford a libel defendant. We need not weigh the merits of the Post–Gazette's argued distinctions between the two privileges, however, because this issue has not been argued to us. We highlight the appellant's footnote for the sole purpose of demonstrating the limited nature of the liability issue on appeal.

10. In the course of its argument in favor of the neutral reportage privilege, however, the Post–Gazette makes brief reference to three

The appellant has not brought to our attention, nor has our independent research disclosed, any Pennsylvania decisions discussing the existence of a constitutional privilege of neutral reportage which would protect from liability a media defendant which reports defamatory statements made against public figures, regardless of the republisher's subjective awareness of the truth or falsity of the accusations. *But see Braig v. Field Communications,* 310 Pa.Super. 569, 587, 456 A.2d 1366, 1376 (1983), *allocatur denied,*

related allegations of trial court error. First, it asserts that the trial judge compounded his error in limiting his instruction to the traditional "knowledge of falsity or reckless disregard for truth" standard of actual malice by instructing on the common law "republication rule." As quoted in the Post–Gazette's brief, the court charged the jury as follows: " 'A newspaper that repeats or otherwise republishes false and defamatory matters is subject to liability as if it had originally published it. . . . ' (R.1735a)" Brief for Appellant at 29. By relegating the rest of the court's charge to an ellipsis, the Post–Gazette has taken the quote out of context and made it extremely misleading. Put into context, the entire sentence reads as follows:

> A newspaper that repeats or otherwise republishes false and defamatory matter is subject to liability as if it had originally published it, unless the publication is otherwise privileged, and I will explain the possible application of privilege later in my charge.

R.R. at 1735a. Clearly the trial court did not err in giving this charge.

Additionally, the Post–Gazette argues in footnote six of its brief that, because the source of the defamatory material contained in its article was a complaint in a will contest, its right to republish the allegations should be protected by both the principle of neutral reportage and "the broad constitutional privilege to report public information. *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975)." Brief for Appellant at 30 n. 6. While reports on judicial proceedings are protected by the common law privilege of fair report, *see supra,* notes 9 & 10 and Restatement (Second) of Torts § 611 comment d, the Post–Gazette elected to limit this footnote argument to broad policy statements by the United States Supreme Court. However, in the brevity of its argument, the appellant fails to recognize the limited reading later given to *Cox Broadcasting.* In *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the court interpreted *Cox Broadcasting* as applying to "the publication of the truthful information contained in official court records open to public inspection," *id.* at 455, 96 S.Ct. at 966 but refused to "extend the reasoning of Cox Broadcasting to safeguard even inaccurate and false statements. . . ." *Id.*

Finally, in footnote seven, the Post–Gazette argues that the public official status of the plaintiff requires special protection for the media to report on issues affecting his qualifications. This, of course, is exactly what the *New York Times* actual malice standard does. Therefore, based on this argument, no further protection is required.

*cert. denied,* 466 U.S. 970, 104 S.Ct. 2341, 80 L.Ed.2d 816 (1984) (court implicitly rejected the neutral reportage doctrine by reversing summary judgment in favor of defendant television station on grounds that jury could find actual malice in rebroadcasting accusations of another where there was evidence that station general manager may have had "serious doubts" about truth of the underlying statements). The trial court, in discussing the Post–Gazette's reliance on *Edwards,* observed:

> Where the issue is whether the Defendant published the defamatory material with knowledge of its falsity or with serious subjective doubts in that regard, a fundamental consideration must accordingly be given to the source of the allegations which are alleged to be tortious. Where, as in *Time Inc.*[11] and *Edwards,* the sources are official governmental records or the report of a renowned private institution, the publisher may justifiably rely on the materials contained therein and must only insure that the re-publication fairly and reasonably distills that which was contained in the original report. Such sources do not raise the "red flags" which the *St. Amant [v. Thompson,* 390 U.S. 727 [88 S.Ct. 1323, 20 L.Ed.2d 262] (1968)[12]]

11. We have distinguished the Supreme Court holding in *Time, Inc. v. Pape, supra,* on grounds other than the *Pape* Court's reliance on the inherent credibility of the source of the defamatory information. It therefore will be unnecessary for us to address the Post–Gazette's argument that there is no language in *Pape* to suggest that the Supreme Court considered the commission report particularly reliable.

12. In developing its definition of actual malice, the trial court relied on *St. Amant* for the proposition that a defendant's protestations of belief in the truth of the statements published must be tested by the finder of fact to determine whether that belief was formed in good faith, *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326, and observed:
 > [T]he Supreme Court has noted that an absence of good faith could be determined where a story was fabricated by the defendant, represented the product of his imagination, or was based upon some anonymous or otherwise unreliable information. Additionally, the allegations themselves may be so inherently improbable that only a reckless publisher would circulate them. Furthermore, in the particular facts of the given case, there may be obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

Court identified, and, unless a plaintiff can prove more particular subjective knowledge on part of the publisher's [sic] that such otherwise credible sources are not to be believed, actual malice is not readily inferable.

Trial Court Opinion p. 14 (footnote omitted). The court then concluded that "[c]ertainly, in the context of this case, Robert Ciaffoni could not be considered a source of information as competent as the United States Civil Rights Commission or the National Audubon Society." *Id.* at 18. For this reason the court determined that *Edwards* did not assist the Post–Gazette.

This reliance on the language in *Edwards* which appears to limit its result to situations where the source of the republished defamation is "a responsible, prominent organization like the National Audubon Society," *Edwards*, 556 F.2d at 120, is not unique to the trial court. In *Cianci v. New Times Publishing Co.,* 639 F.2d 54 (2d Cir.1980), the Second Circuit was faced with the application of its own doctrine in deciding whether the district court had been correct in dismissing a complaint in libel. The Court of Appeals determined that the dismissal was error on the grounds that, *inter alia,* the defendant was not shielded by the constitutional privilege of neutral reportage. Prior to reaching this conclusion, however, the court felt it necessary to closely examine the language of the *Edwards* opinion to discern the scope of the privilege stated therein.[13]

In conducting this review, the court noted as limiting language

Trial Court Opinion at 11–12 (citations omitted). These are the "red flags" to which the trial judge is referring.

**13.** It may initially seem uncertain whether the language in *Edwards* was intended to create doctrinal limitations or merely to be descriptive of the particular facts of the case. *See* Comment, *Constitutional Privilege to Republish Defamation,* 77 Columbia L.Rev. 1266, 1275–1276 (1977). However, when Chief Judge Kaufman, the author of *Edwards,* concurred in the decision in *Cianci* to deny a rehearing before the court en banc, *Cianci,* 639 F.2d at 71, it became apparent that he intended the former. Although he observed that "the panel [in *Cianci* ] does not always discuss *Edwards* in the terms I would have chosen," *id.,* he was content that the opinion in *Cianci* was not inconsistent with *Edwards.*

the statements that "when a responsible, prominent organization like the National Audubon Society makes serious charges against a public figure, the First Amendment protects the accurate and disinterested reporting of these charges, regardless of the reporter's private views regarding their validity"; that "[w]hat is newsworthy about these accusations in that they were made"; that "[t]he public interest in being fully informed about such controversies that rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them"; that while "we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith that his report accurately conveys the charges made ... [i]t is equally clear, however, that a publisher who in fact espouses or concurs in the charges made by others or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage" but rather "assumes responsibility for the underlying accusations"; that the Times had "published the maligned scientists' outraged reactions in the same article that contained the Society's attack"; that the article was "the exemplar of fair and dispassionate reporting of an unfortunate but newsworthy contretemps"; and that "[w]e believe that the *New York Times* cannot, consistently with the First Amendment, be afflicted with a libel judgment for the accurate reporting of newsworthy accusations made by a responsible and well-noted organization like the National Audubon Society." 556 F.2d at 120–22.

*Cianci,* 639 F.2d at 68–69 (footnote omitted). The court then observed that "[t]he New Times article fulfills almost none of the conditions laid down in *Edwards*," *id.* at 69, and concluded that "it is enough for decision in this case that a jury could well find that the New Times did not simply report the charges but espoused or concurred in them...." *Id.*

Although the court bottoms its holding on the republisher's apparent adoption of the charges made, we are not constrained to read this as the only limitation to be placed on *Edwards*. After discussing how the evidence could be read to indicate an espousal of the charges, the court made the following statement:

The need for the careful limitation of a constitutional privilege for fair reportage is demonstrated by the breadth of that defense, which confers immunity even for publishing statements believed to be untrue. Absent the qualifications set forth by Chief Judge Kaufman in *Edwards*, all elements of the media would have absolute immunity to espouse and concur in the most unwarranted attacks, at least upon any public official or figure, based on episodes long in the past and made by persons known to be of scant reliability. And this, although without any such immunity, the media already enjoy the generous protection accorded by *New York Times Co. v. Sullivan* with respect to erroneous statements of fact or opinion.

*Id.* at 69–70.

It is clear from the language of *Edwards* and *Cianci* that the privilege of neutral reportage is both limited and conditional, that is, it may be lost if its terms are not followed. *Binder v. Triangle Publishers, Inc.*, 442 Pa. 319, 324, 275 A.2d 53, 56 (1971) ("A qualified privilege is one that can be lost by abuse"). Drawing from the language quoted by the *Cianci* court, then, the rule can be stated as follows: A reporter is privileged to publish the serious charges of a responsible, prominent entity (either an organization or individual, as there is no reason to believe the *Edwards* court intended a distinction) involved in a raging controversy and concerning a public official or public figure, irrespective of the publisher's belief as to the falsity of the charges, provided the reporter does not espouse or concur in the charges and reasonably and in good faith believes the report accurately conveys the charges made. Therefore, entitlement to the privilege is determined by the following elements: (1) the character of the defamer; (2) the charac-

ter of the controversy; and (3) the character of the defamed. The privilege is lost through abuse depending on the nature of the republication. *See* Comment, *Constitutional Privilege, supra,* note 13, at 1275–1281.[14]

Other courts applying the neutral reportage doctrine as a constitutional privilege have similarly limited *Edwards. See, e.g., Dixson v. Newsweek, Inc.,* 562 F.2d 626, 631 (1977) (the defamed party must be a public official or figure); *Lasky v. American Broadcasting Companies, Inc.,* 631 F.Supp. 962, 970–971 (S.D.N.Y.1986) (tracks *Cianci* ); *Barry v. Time, Inc.,* 584 F.Supp. 1110, 1127 (N.D.Ca.1984) (defamed is public figure involved in an existing controversy with the defamer); *McManus v. Doubleday & Co., Inc.,* 513 F.Supp. 1383, 1391 (S.D.N.Y.1981) (limits to preexisting public controversies—not apply to investigative reporting); *Davis v. Keystone Printing Service, Inc.,* 155 Ill.App.3d 309, 324, 108 Ill.Dec. 17, 28, 507 N.E.2d 1358, 1369 (1987) (defamed must be a public figure and defamer must be responsible prominent person); *Martin v. Wilson Publishing Co.,* 497 A.2d 322, 330 (R.I.1985) (defamer must be prominent responsible organization). For additional cases see Note, *The Developing Privilege of Neutral Reportage,* 69 Va.L.Rev. 853, 864–865 nn. 60–62 (1983). We are troubled by this formulation, however, because of the apparent absence of a constitutional foundation for this purported

**14.** The *Cianci* court appears to have held that the privilege did not arise because the report could be found by the jury to have espoused or concurred in the charges. This, it seems, put the cart before the horse; the court decided that the privilege was abused before deciding whether, in fact, it ever attached. However, in terms of whether the defendant will be aided by the privilege, this observation is one of pure semantics, for, whether it is lost through defeasance, or never arises, is of little moment. But, in terms of practice, the observation is important. In Pennsylvania, the question whether a privilege applies in a defamation action is one for the trial court, *Smith v. Griffiths,* 327 Pa.Super. 418, 423, 476 A.2d 22, 25 (1984) *allocatur denied,* but it is for the jury to determine whether a privilege has been abused. *Sprague v. Walter,* 357 Pa.Super. 570, 604, 516 A.2d 706, 724 (1986) *allocatur granted,* 514 Pa. 648, 524 A.2d 495 (1987).

In light of our resolution of the question in the case *sub judice,* we need not expand on this discussion at the present time, leaving it for development when the court is faced with an appropriate set of facts.

First Amendment protection. To better explain our conundrum we turn to cases which have expressly rejected the rule.

The leading federal case in this category is *Dickey v. CBS, Inc.*, 583 F.2d 1221 (3d Cir.1978).[15] In *Dickey*, the court refused to adopt *Edwards* on the grounds that the stated doctrine was contrary to established Supreme Court precedent. The court's refusal centered on the *Edwards* court's lack of concern for the publisher's reckless disregard of the truth and its effect on liability, and concluded that,

> [w]hile the Second Circuit found that there can be no liability despite the publisher's "serious doubts" as to the truthfulness, *St. Amant* [*v. Thompson*, 390 U.S. 727] holds that for libel against a public figure to be proved, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained *serious doubts* as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U.S. at 731, 88 S.Ct. at 1325.

*Id.* at 1225 (emphasis added by the Third Circuit).

The *Dickey* court concluded that the *Edwards* expression of a neutral reportage privilege also runs afoul of Supreme Court precedent when it establishes as the trigger for the constitutional protection the publication of a "newsworthy" statement. *Id.* at 1226 n. 5. Using a standard based on the content of the statement for determining when the constitution will limit the States' powers to protect its citizens from defamatory falsehoods, the court argues, was expressly rejected by the Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 346, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789

**15.** In *Medico v. Time, Inc,* 643 F.2d 134 (3d Cir.) *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981), the court held that the *Dickey* court's refusal to follow *Edwards* was stated in dicta, thereby leaving the question of the viability of neutral reportage in this circuit open. *Id.* at 145. However, as we have observed, the rule itself was given life under similar circumstances, and because we are giving the rule serious consideration in spite of its questionable nascency, we see no reason to treat its critics any differently.

(1974) ("The 'public or general interest' test ... inadequately serves both of the competing values at stake"). *Accord Makis v. Area Publications Corp.*, 77 Ill.App.3d 452, 463, 32 Ill.Dec. 804, 812, 395 N.E.2d 1185, 1193 (1979) (Romiti, J., dissenting) ("[I]t is not sufficient if the defamation concerns private persons involved in matters of public or general concern."); *Hogan v. Herald Co.*, 84 A.D.2d 470, 477, 446 N.Y.S.2d 836, 842 *aff'd*, 58 N.Y.2d 630, 458 N.Y.S.2d 538, 444 N.E.2d 1002 (1982) ("Presumably, all publications of the news media are newsworthy."). For additional cases, see Note, *Neutral Reportage, supra*, at 863 n. 53.

A second line of cases has refused to recognize a constitutional privilege of neutral reportage on the grounds that such a privilege would be superfluous. For example, the Michigan Court of Appeals "decline[d] to embrace *Edwards* as the press is adequately protected by the burden of proof required in *Sullilvan.*" *Postill v. Booth Newspaper, Inc.*, 118 Mich.App. 608, 622, 325 N.W.2d 511, 578 (1982); *accord, Janklow v. Viking Press, Inc.*, 378 N.W.2d 875, 881 (S.D. 1985) ("[T]he media already enjoys the generous protection accorded by *New York Times Co. v. Sullivan* with respect to erroneous statements of fact and opinion"). As an embodiment of both of these criticisms, an Illinois court concluded "that the constitutional limitations on the liability of the press for libel have been *fully* and *exclusively* expressed by the Supreme Court in *Time, Inc. v. Firestone* (1976), 424 U.S. 448 [96 S.Ct. 958] ... *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, [94 S.Ct. 2997,] ... *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, [87 S.Ct. 1975] ... and *New York Times v. Sullivan* (1964), 376 U.S. 254, ... [84 S.Ct. 710]." *Newell v. Field Enterprises, Inc.*, 91 Ill.App.3d 735, 757–58, 47 Ill.Dec. 429, 447, 415 N.E.2d 434, 452 (1980) (emphasis added).

We note, in support of this argument, that, at least at this stage in the development of the rule, no court choosing to rely on neutral reportage to protect a defamation defendant has had to do so exclusively. For example, in *Edwards* itself the court found that "[e]ven absent the special protec-

tion afforded to neutral reportage, . . . the evidence adduced at trial was manifestly insufficient to demonstrate 'actual malice' on the part of the *Times.*" *Edwards,* 556 F.2d at 120. Also, in *Barry v. Time, Inc.,* 584 F.Supp. 1110 (1984), an opinion enthusiastically embracing neutral reportage, the court granted a motion for summary judgment in favor of the publisher on the dual grounds that the amended complaint failed to plead actual malice with sufficient specificity, and that the publisher was constitutionally protected by the privilege of neutral reportage.

The criticism that the rule is superfluous, however, misses the intent of the neutral report privilege as expressed in *Edwards.* The privilege is superfluous only if its protection is coextensive with actual malice. It is not. As we have seen, under *New York Times Co. v. Sullivan, supra,* the Constitution protects the publishing of defamatory falsehoods unless it is shown "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–280, 84 S.Ct. at 726. The doctrine of neutral reportage anticipates a broader protection than this, believing "that the press may [not] be required under the First Amendment to suppress newsworthy statements merely because it has serious doubts regarding their truth." *Edwards,* 556 F.2d at 120. Thus, while the two doctrines overlap when actual malice cannot be shown, and a separate privilege of neutral reportage would indeed be redundant, when knowledge of or a reckless disregard as to falsity exists, it is clear that neutral reportage stands alone in asserting a constitutional privilege to publish. This, then, is the context within which we must analyze neutral reportage.

Although this conclusion is sufficient to dispose of the redundancy argument, it is merely the first step in deciding whether *Edwards* runs afoul of *New York Times* and its progeny. For this broader First Amendment protection to stand, a basis in the Constitution must be found other than that which justifies the requirement of actual malice. Oth-

erwise, the privilege of neutral reporting must fail because it would upset the balance already struck by the Supreme Court in protecting our constitutional freedoms of expression and the countervailing state interest in protecting reputation.

Proof of actual malice was deemed necessary because of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times*, 376 U.S. at 270, 84 S.Ct. at 721. Even the occasional erroneous statement, inevitable in free debate, "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.' " *Id.* at 271–272, 84 S.Ct. at 721.

Thus, in order to protect our system of self-government by guaranteeing the free flow of information essential to that purpose, those who have sought official positions within the government (public officials) and those who have "assumed roles of especial prominence in the affairs of society" (public figures), *Gertz*, 418 U.S. at 345, must endure the publication of defamatory falsehoods so long as it is done without actual malice. However, this does not amount to a blanket protection for all falsehoods; rather, "[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 341, 94 S.Ct. at 3007. Therefore, the actual malice standard continues to recognize that "[n]either the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Id.* at 340, 94 S.Ct. at 3007 (citation omitted).

In *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), the Supreme Court reasserted the breadth of the actual malice protections when it refused to acknowledge a chilling effect on editorial decisionmaking if public defamation plaintiffs are allowed to inquire into the editorial processes of the defendant, noting that, "if the

claimed inhibition flows from the fear of damages liability for publishing knowing or reckless falsehoods, those effects are precisely what *New York Times* and other cases have held to be consistent with the First Amendment. Spreading false information in and of itself carries no First Amendment credentials." *Id.* at 171, 99 S.Ct. at 1646. It is clear, then, that neutral reportage, which seeks to protect the knowing publication of falsehoods, would indeed upset this balance if placed on the actual malice scale.

In attempting to provide a constitutional foundation for neutral reportage, the *Edwards* court relied on the rationale of the "public's need to know," by noting that "[t]he public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report [defamatory] charges without assuming responsibility for them." *Edwards,* 556 F.2d at 120. However, the court distanced itself from the rationale behind the actual malice standard when it stated that "[w]hat is newsworthy about [serious charges made by a prominent organization against a public figure] is that they were made," *id.,* thereby finding the constitutional value of the statement in the nature of the defamer and his relationship to the controversy, not in the status of the person defamed.

We reach this conclusion for the compelling reason that, if the focus was on the party defamed, the balance struck by actual malice would be offended if not followed. Therefore, the speech which is to be protected by neutral reportage is not the defamatory falsehood itself, but the speech required to convey the information that a certain individual involved in a controversy made a particular charge. Describing the protected speech in this manner helps to explain why, with neutral reportage, the subjective awareness of the republisher that the statement is false becomes irrelevant. An analogy may be drawn to the hearsay rule of evidence. Where the out of court statement is offered to prove the truth of the matter asserted in the statement, it will be excluded; but if the fact that the statement was

made has significance independent of its truth, it will be admitted. *See,* Note, *Neutral Reportage, supra,* at 867 n. 75.

Recognizing the belief that "no statement is significant merely because it is said unless the identity if the speaker has some special significance," Comment, *Constitutional Privilege, supra* note 13, at 1276, we now return to our concern about the *Edwards* statement of the neutral reportage doctrine. As we have noted, *Edwards,* and *Cianci* interpreting *Edwards,* focused on the prominence and reliability of the original defamer to determine whether the protections of neutral reportage should apply. Neither of these criteria, however, are sufficiently related to the First Amendment interests in protecting the republished defamation to serve as the basis for a constitutional privilege.

The mere fact that a speaker is known to be reliable is not sufficient to entitle that person's words to constitutional protection irrespective of the reporter's knowledge that the statement is false. In fact, because neutral reportage intends to protect the publication of statements known to be false, the purported reliability of the source is totally irrelevant.[16] Conversely, the unreliability of a speaker should not automatically disqualify his words from protection. For example, in *Oliver v. Village Voice, Inc.,* 417 F.Supp. 235 (S.D.N.Y.1976), decided before *Edwards,* the court granted summary judgment for the defendant on the issue of actual malice over the plaintiff's protestations that the informant, Watergate figure E. Howard Hunt, Jr., was inherently unreliable, stating that "the mere fact of [Hunt's] making a statement, given his prominent position in the Watergate

16. The reliability of the defaming party was deemed relevant in determining whether the publisher acted with reckless disregard for the truth of the published statement at the very genesis of the actual malice rule. In *New York Times,* the Supreme Court found that the publishers' reliance "upon their knowledge of the good reputation of many of those whose names were listed as sponsors of the advertisement ... was not unreasonable." *New York Times,* 376 U.S. at 287, 84 S.Ct. at 730. In neutral reportage, however, the issue is not the publisher's subjective awareness of falsity because that is assumed. *See supra.*

controversy, would be a legitimate news story." *Id.* at 238. In criticizing a "reliability" standard, the court in *Barry v. Time, Inc., supra,* noted the absence of "a cogent policy reason for differentiating among defamers on the basis of their trustworthiness or credibility. Indeed, the primary rationale of *Edwards*—the public interest in being fully informed about public controversies—is inconsistent with such a differentiation. Moreover, it could create a chilling effect on the members of the press if they are required to be arbiters of how 'trustworthy' a source is." *Barry,* 584 F.Supp. at 1126.

However, the *Edwards* court's reliance on the prominence of the defaming party shows greater promise in furthering the rule's purpose of protecting the free dissemination of information about public issues. As we have noted, a defamatory falsehood has no constitutional value and does not enhance our system of self-government. However, if the speaker of the defamatory falsehood has a significance to the controversy at issue, the reporting of that falsehood takes on an importance independent of the substance of the statement. For example, if a state's governor falsely accuses the mayor of one of that state's major cities of mismanagement, the reporting of this charge gives the electorate a valuable insight into the character of their state's top official.

Similarly, when a private advocacy group seeks a role in shaping public policy, a circumstance strongly encouraged in this country, the reporting of false charges by that group will allow the public to define for itself the credibility, or even desirability of that group's proposals for reform. As the Supreme Court recognized in *New York Times,* "[e]ven a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" *New York Times,* 376 U.S. at 279 n. 19, 84 S.Ct. at 725 n. 19 (citation omitted).

Therefore, the newsworthiness of the statement stems from the importance of the speaker to the controversy at

issue and the fact that anything he says has value within the context of that controversy. This conclusion neutralizes the criticism that a neutral reportage privilege violates the teaching of *Gertz*, where the Supreme Court refused to accept as a triggering device for the actual malice standard whether the publication is newsworthy because it addresses issues of "general or public interest." *Gertz*, 418 U.S. at 346, 94 S.Ct. at 3010. Newsworthiness, in the neutral reportage sense, is not based on an analysis of the content of the speech to be protected; rather, it is determined by the status of the defaming party.

The final issue in describing the neutral reportage doctrine, then, is how to determine when a defamer is sufficiently prominent to make his or her statements newsworthy. The logical solution appears to be the adoption of the same public figure/public official standard applied to the plaintiff in an actual malice situation. If the party making the false charge is a public official, it is essential for the public to be informed of the calumny of those upon whom it has bestowed its trust, and thereby to better supervise their conduct. Similarly, if a public figure, embroiled in a controversy, levels false accusations against others involved in the same contest, the public's ability to weigh the merits of the vying positions is greatly enhanced by the publication of the charges. In addition to the appropriateness of these classifications to the constitutional purposes of neutral reportage protection, there is the added advantage that the mechanism for determining whether an individual can be fairly classified as either a public figure or public official is already firmly in place.

Therefore, we hold that if neutral reportage is to be recognized as a constitutional privilege, it can offer protection irrespective of the publisher's belief in the truth or falsity of the charges only when a public official or a public figure already embroiled in a public controversy levels a false charge against a public official or figure. The privilege, once it has arisen, will be preserved only if the reporter neither espouses nor concurs in the charge and in

good faith believes the report accurately conveys the charges made. Because the facts of this case do not fit into the above statement of the privilege, we cannot now hold that the constitutional privilege of neutral reporting will be recognized in Pennsylvania, and do not so hold.

Of the three requirements necessary to invoke the privilege, only the third element, the status of the defamed party, has been met. The party making the charge, Robert Ciaffoni, is not and does not claim to be either a public official or a public figure, and the bitter dispute over the validity of Paul Ciaffoni's will, while perhaps of some interest to the public, is not the type of controversy about which the public needs to be informed to better exercise the right of self-government. Therefore, the question of a constitutional privilege of neutral reporting must remain open in this jurisdiction until the court is presented with a proper case. We hold that the trial court did not err in its application of the *New York Times* actual malice standard, nor did it err in instructing the jury on that standard.

## II

### COMPENSATORY DAMAGES

■ The second category of error raised by the appellant asserts that the trial court was remiss in permitting the jury to assess compensatory damages for present or future harm where the trial record discloses no evidence to even suggest that the appellees were suffering or might suffer any present or future harm as a result of the article. The appellees respond that this issue, while preserved by objection following the trial court's charge to the jury and raised in the appellant's motion for new trial, was abandoned when the appellant failed to brief or argue the issue to the trial court and therefore was not preserved for our review. We agree.

Post-trial practice is governed by Pa.R.C.P. 227.1, which requires timely objection and specific mention in a post-trial motion before an issue may be considered by the post-trial court. Pa.R.C.P. 227.1(b). The purpose for this rule is to afford the trial court the opportunity to correct an error at

the time it is made, and to inform the court of the issues which must be decided at the post-trial stage, *id.,* Explanatory Comment—1983, thereby giving it the first opportunity "to review and reconsider the determination it made at trial." *Weir by Gasper v. Ciao,* 364 Pa.Super. 490, 494, 528 A.2d 616, 618 (1987).

To fully effectuate the latter purpose, common sense mandates that any issue raised in the motion for post-trial relief must also be briefed and argued to the trial court. Thus, this court, after stating the requirements of rule 227.1(b), went on to note that, "[m]oreover, failure to set forth an argument in briefs filed in the court in support of post-trial motions constitutes a failure to preserve the issue or issues not argued." *Bryant v. Girard Bank,* 358 Pa.Super. 335, 344, 517 A.2d 968, 973 (1986). The appellant did not list as an issue in its brief in support of post-trial motions any challenge to the compensatory damages awarded by the jury, nor did the argument contained therein assert such a challenge in the context of any related issues.[17]

This failure "deprived the trial court of both the need and opportunity to address the merits of the [appellant's] post-trial contentions in this regard," *Scarborough by Scarborough v. Lewis,* 359 Pa.Super. 57, 62–63, 518 A.2d 563, 566 (1986), leaving us, as an appellate court, with nothing to review. We therefore hold that the appellant's challenge to the compensatory damages award has been waived and may not serve as a basis for relief.

## III

## PUNITIVE DAMAGES

The final challenge made by the appellant concerns the award of $2,000,000.00 in punitive damages. This challenge

---

**17.** The appellees also assert that a challenge was not made to the compensatory damage award during oral argument. The appellant counters that no transcript of the oral argument was made and therefore that such a statement is at best conjecture. Conspicuously, the appellant does not further assert that it did raise the issue in oral argument.

asserts two levels of error on the part of the trial court: first, that the trial court erred in allowing the jury to assess punitive damages at all; and second, that the trial court failed to properly limit the amount of the punitive damages awarded. We find no error.

### A. Liability

█ In pressing its argument that the trial court should not have submitted the issue of punitive damages to the jury at all, the Post–Gazette asserts that the standard applied in determining whether a jury question existed was insufficient to protect its constitutional rights under the First Amendment. The trial court, in deciding to put the question to the jury, considered punitive damages appropriate only if both actual malice and common law malice were established by clear and convincing evidence. Actual malice, as we have seen, involves publication with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 278–279, 84 S.Ct. at 725. Common law malice, in the context of punitive damages, involves " 'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others,' . . . 'conduct which is " 'malicious,' 'wanton,' 'reckless,' 'willful,' or 'oppressive'. . . .' " ' " *Feld v. Merriam*, 506 Pa. 383, 395, 485 A.2d 742, 747–748 (1984) (citations omitted) (adopting Restatement (Second) of Torts § 908(2)). "Punitive damages may be given when the act is done with reckless indifference, as well as, bad motive." *Delahanty v. First National Bank, N.A.*, 318 Pa.Super. 90, 130, 464 A.2d 1243, 1263 (1983).

The Post–Gazette, not challenging the sufficiency of the evidence under either of these standards,[18] urges that punitive damages should only be allowed when the evidence shows *actual* knowledge of falsity and *actual* intent to

18. In section I of this opinion we disposed of the appellant's challenge to the definition of actual malice put to the jury. However, in that challenge, the appellant did not assert that the evidence was insufficient to meet the *New York Times* statement of actual malice as it has evolved since 1964, which we determined the trial court correctly articulated.

harm. Its argument is that, by allowing the jury to consider recklessness, that is, reckless disregard of falsity and reckless indifference to the plaintiff's rights, an award of punitive damages could be made based solely on such a determination, which would not sufficiently protect robust reporting. We find no basis for this "actualness" standard in the law, or in logic.

We again begin our analysis with the federal Constitution because of the First Amendment issues involved. The United States Supreme Court, to date, has not asserted any constitutional constraints on the awarding of punitive damages to a public official in a defamation action. In the context of a private figure libel suit, the Court has directed that, while liability may be decided by any standard which necessarily involves a finding of fault, punitive damages may not be allowed unless there has been "a showing of knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974). The rationale for this distinction recognizes that the states have a "strong and legitimate ... interest in compensating private individuals for injury to reputation," *id.* at 348, 94 S.Ct. at 3011, but that "punitive damages are wholly irrelevant to [this] state interest ...," and that "jury discretion to award [such] damages unnecessarily exacerbates the danger of media self-censorship." *Id.* at 350, 94 S.Ct. at 3012.

Although the Post–Gazette would have us read the logic of *Gertz* as "point[ing] ineluctably to the conclusion that punitive damages may never be awarded in defamation cases," Brief for Appellant at 34 n. 8, the concurring opinion of Justice Blackmun, who voted to join the opinion of the Court on the ground that his vote was necessary to create a majority, *Gertz*, 418 U.S. at 354, 94 S.Ct. at 3014, clearly indicates the contrary. Commenting on the court's holding that actual malice must be proven before punitive damages may be awarded, he concluded that "the court leaves what should prove to be sufficient and adequate breathing space for a vigorous press." *Id.* Further evi-

dence of the continuing constitutionality of punitive damages in defamation cases came recently in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (Powell, J., announcing the judgment of the court).

The plurality in *Greenmoss Builders* found relevance in the fact that *Gertz*, while not involving either public official or public figure, did involve a publication which touched upon matters of public concern. *Id.* at 757, 105 S.Ct. at 2944. Noting that the communication in *Greenmoss Builders* concerned matters of purely private concern (inaccurate confidential credit reports), the plurality applied the *Gertz* analysis balancing the state interest in protecting reputation against the First Amendment interest in protecting expression, and concluded that, "[i]n light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest adequately supports awards of presumed and punitive damages—even absent a showing of 'actual malice.' " *Id.* at 761, 105 S.Ct. at 2946 (footnote omitted).

The facts in *Greenmoss Builders*, however, diverge from *Gertz* in the wrong direction to be of immediate assistance to us on the issue of punitive damages in this case. *Greenmoss Builders* suggests that when the public configuration of a defamation case is less than that presented in *Gertz*, that is, private plaintiff/private speech versus private plaintiff/public speech, the standard to be applied in the awarding of punitive damages need not include actual malice. The question we face is what standard to apply when the plaintiff is a public official rather than a private individual. Because speech about a public official is, by definition, of public concern, there is no need to discuss the characterization of the nature of speech here.[19] Therefore the only

19. In one of the Supreme Court's recent defamation decisions, *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), Justice O'Connor recognized

two forces that may reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is

relevant factual distinction between the instant case and *Gertz* is the public status of the plaintiffs. We conclude that, in the context of punitive damages, the same standard required by *Gertz* would be required where the plaintiff is a public official.

We reach this conclusion by contrasting the *Gertz* Court's discussion of liability with its discussion of punitive damages, as did the Court in *Greenmoss Builders*. In holding that the states may impose *liability* for defamation against private individuals on a less demanding showing than actual malice, the Court had "no difficulty in distinguishing among defamation plaintiffs." *Gertz*, 418 U.S. at 344, 94 S.Ct. at 3009. As part of this distinction, the Court emphasized that a private plaintiff has less access to the self-help remedy of rebuttal, and that the private plaintiff has not put himself in a position of having to accept the risk of closer public scrutiny. *Id.* at 344–345, 94 S.Ct. at 3009. "For these reasons we conclude that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." *Id.* at 345–346, 94 S.Ct. at 3010. Thus, it is the strength of the state's legitimate interest in providing a legal remedy which forces the different *liability* stan-

whether the speech at issue is of public concern. When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure, as in Gertz, the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, as in Dun & Bradstreet, the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape.

*Id.* at 775, 106 S.Ct. at 1563. Although this characterization leaves open the theoretical possibility of a public plaintiff and a private concern, Justice O'Connor does not discuss the constitutional ramifications of such a configuration. Further, we doubt the significance of such a possibility in light of the Court's expansive reading of the "official conduct" element in the actual malice formula. *See supra* Section IA.

dards in public plaintiff versus private plaintiff defamation actions.

In its discussion of *punitive damages*, however, the court disavowed any public/private distinction by holding that the resultant "countervailing state interest extends no further than compensation for actual injury," *id.* at 349, 94 S.Ct. at 3011, and later noting that "punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for [liability in] private defamation actions." *Id.* at 350, 94 S.Ct. at 3012. Thus, the court's concern that "jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship," *id.*, exists with equal force whether the plaintiff is public or private, and any limitations on the recovery of punitive damages would apply equally in either case.

Therefore, in order to hold that something more than actual malice is constitutionally required for a public official versus a private individual to recover punitive damages in a defamation action, as the Post–Gazette would have us do, we must conclude that the Supreme Court would find it necessary to fashion an entirely new First Amendment rationale when faced with the question. We see no such indication in the Court's recent pronouncements. *See Greenmoss Builders, supra; see also, id.* 472 U.S. at 780, 105 S.Ct. at 2956 (Brennan, J., dissenting, joined by Marshall, Blackmun, and Stevens, JJ.) (as to punitive damages, when the plaintiff is a public official or figure, "the need to nurture robust debate of public issues and the requirement that *all* state regulation of speech be narrowly tailored coalesce to require actual malice as a prerequisite to *any* recovery." (emphasis added)). In fact, when asked to modify the actual malice standard to further protect the press in *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), the Court refused, noting that "in the 15 years since New York Times, the doctrine announced by that case, which represented a major development and which is widely perceived as essentially protective of press freedoms, has been repeatedly affirmed as the appropriate

First Amendment standard applicable in libel actions brought by public officials and public figures." *Id.* at 169, 99 S.Ct. at 1645. To the extent that the appellant argues for greater protection on the grounds that a public plaintiff must prove actual malice to establish liability, and should be required to prove more to recover punitive damages, we note that the Supreme Court has never held that the Constitution mandates such an escalation in the standard of proof between compensatory and punitive damages. *See Smith v. Wade,* 461 U.S. 30, 53–54, 103 S.Ct. 1625, 1639, 75 L.Ed.2d 632 (1983); *Curtis Publishing Co. v. Butts,* 388 U.S. at 159, 87 S.Ct. at 1993–94.

■ Our conclusion that proof of actual malice by a public official is constitutionally sufficient to trigger a jury's consideration of punitive damages is not the end of the inquiry, however. We must now determine whether Pennsylvania offers greater protection than that which the federal Constitution requires. Again we find no cases directly addressing the issue. Before actual malice was introduced into the defamation formula for punitive damages, proof of common law malice was required to recover punitive damages. *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 186–187, 191 A.2d 662 (1963). With the decision in *Gertz,* Pennsylvania added the requirement of actual malice. *Hepps v. Philadelphia Newspapers, Inc.,* 506 Pa. 304, 485 A.2d 374 (1984), *rev'd on other grounds,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *Sprague v. Walter,* 357 Pa.Super. 570, 516 A.2d 706 (1986) *allocatur granted,* 514 Pa. 648, 524 A.2d 495 (1987); *Banas v. Matthews International Corp.,* 348 Pa.Super. 464, 502 A.2d 637 (1985) (en banc), *allowance of appeal denied* (1986); *Walder v. Lobel,* 339 Pa.Super. 203, 488 A.2d 622 (1985); and *Wilson v. Benjamin,* 332 Pa.Super. 211, 481 A.2d 328 (1984). What none of these cases expressly considers, however, is whether there is a continuing need to show common law malice.

Thus, in *Sprague, supra,* the court expressly required actual malice without mentioning common law malice, but the court's opinion disclosed evidence of common law mal-

ice. *Sprague,* 357 Pa.Super. at 610, 516 A.2d at 727. In *Banas, supra* at 470, 502 A.2d at 640 and *Wilson, supra* at 220, 481 A.2d at 332, the court had no opportunity to reach the issue because punitive damages were precluded by a failure to prove actual malice. In *Walder, supra,* the result is especially difficult to interpret because the court purports to require "actual malice," but cites to *Feld v. Merriam, supra,* a non-defamation case which relied exclusively on common law malice. *Walder,* 339 Pa.Super. at 211, 488 A.2d at 626 (1985).

Two cases, however, do suggest that Pennsylvania may continue to require a showing of common law malice, even when actual malice is required. Our supreme court in *Hepps, supra,* like the courts in *Banas* and *Wilson, supra,* did not reach the issue of common law malice because it disposed of the punitive damages issue on the ground that actual malice was not established. *Hepps,* 506 Pa. at 330, 485 A.2d at 388. However, in discussing the sufficiency of the evidence to show actual malice, the court noted that "[t]he publisher's hatred, spite, hostility or deliberate intention to harm the plaintiff is not sufficiently probative of his knowledge of falsity or awareness of probable falsity so as to allow its admissibility where 'actual malice' is at issue, *but once established, the elements heretofore enumerated would be admissible." Id.,* 506 Pa. at 331, 485 A.2d at 388 (emphasis added). The issue was punitive damages. If the "elements heretofore enumerated" were admissible, but not for the purpose of proving actual malice, the only other purpose would be to prove common law malice. Therefore, unless proof of common law malice was implicitly considered necessary by the supreme court for an award of punitive damages, the language we have emphasized would be mere surplusage.

This interpretation of *Hepps* may have been the basis for the Third Circuit Court of Appeals' conclusion in *Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 15 (1985), a public figure defamation case, that

"[t]he district judge's instruction that plaintiff had to prove 'outrageous conduct' [to recover punitive damages] appears to be an accurate reflection of Pennsylvania law. However, to be permissible, the charge also had to meet the First Amendment requirements established by the Supreme Court." *Id.* at 1088 (footnote to *Hepps* omitted).[20]

In the second case, *Frisk v. News Co.*, 361 Pa.Super. 536, 523 A.2d 347 (1986) *allocatur denied*, 515 Pa. 614, 530 A.2d 867 (1987), the issue of the proper standard to be applied in submitting the issue of punitive damages to the jury was not expressly addressed. However, the court held that, in light of the defendant's conduct, the punitive damage award as remitted was appropriate, and cited to *Marcone v. Penthouse International, Ltd.*, 577 F.Supp. 318 (E.D.Pa.1983) *rev'd sub nom. Marcone v. Penthouse International Magazine for Men*, *supra* (requiring actual malice and common law malice for recovery of punitive damages under Pennsylvania law), and *Purcell v. Westinghouse Broadcasting Co.*, *supra* (pre-actual malice decision stating the rule in terms of common law malice). *Frisk*, 361 Pa.Super. at 549, 523 A.2d at 353.[21]

The appellant cites us to *Geyer v. Steinbronn*, 351 Pa.Super. 536, 506 A.2d 901 (1986) for the proposition that punitive damages are appropriate only when the defendant's conduct is more egregious than that which is required to establish liability. *Id.*, 351 Pa.Superior Ct. at 562, 506 A.2d at 915. However, as the Post–Gazette reluctantly notes,

**20.** The court's requirement that the charge on punitive damages must include "actual malice" is not to be understood as requiring that the definition of actual malice must be repeated if it has already been given in the charge on liability. The trial court in *Marcone* had ruled that the plaintiff was a private figure and therefore had not included actual malice in its charge on liability.

**21.** In a footnote to this discussion, the court answered the appellant's contention that punitive damages are constitutionally impermissible in public figure libel actions by quoting from Justice Harlan's plurality opinion in *Curtis Publishing Co. v. Butts, supra,* to the effect that misconduct sufficient to justify compensatory damages also justifies punitive damages. *Frisk,* 361 Pa.Super. at 549 n. 4, 523 A.2d at 353 n. 4. The apparent inconsistency need not be reconciled, however, because the issue in the footnote was entirely different from the issue in the text.

the *Geyer* opinion footnotes this statement with a recognition that an apparent exception to the rule is the case where proof of actual malice is required to establish liability. *Id.*, 351 Pa.Superior Ct. at 562 n. 10, 506 A.2d at 915 n. 10. Therefore, the appellant's reliance on this principal, previously rejected as a constitutional requirement, *supra,* must also be rejected as an element of Pennsylvania precedent in this case.

The appellant nonetheless argues that the result in *Geyer* mandates the "more egregious" rule it proposes. *Geyer* was a private plaintiff/private issue case decided in the wake of the United States Supreme Court's decision in *Greenmoss Builders, supra.* Judge Beck, writing alone on the proper standard to be applied for the allowance of punitive damages in such a case,[22] reasoned that, in spite of *Greenmoss Builders,* the proper course was to require proof of actual malice. However, she did not reach this conclusion on the ground that actual malice was more egregious conduct, as the Post–Gazette suggests. Rather, she noted that the purpose of punitive damages is to punish past conduct and to deter further repetition, *Geyer,* 351 Pa.Super. at 562, 506 A.2d at 915, and, juxtaposing actual malice and common law malice as definitions of two types of blameworthy conduct, she decided that actual malice describes "more clearly the kind of intentionally wrongful conduct which should be the subject of our concern in imposing punitive damages in defamation actions." *Id.,* 351 Pa.Superior Ct. at 563, 506 A.2d at 915.

Therefore, even under *Geyer,* we are not looking for egregious conduct in the quantitative sense when setting a standard for the award of punitive damages, the appellant's "more egregious" argument; rather, we are looking for

22. The *Geyer* panel was comprised of (then) President Judge Spaeth, and Judges Beck and Tamilia. Judge Beck wrote the opinion for the panel. President Judge Spaeth concurred in the result, but did not join in Judge Beck's discussion of punitive damages, feeling that our supreme court's opinion in *Hepps* established the law in the Commonwealth and that *Greenmoss Builders* was irrelevant. Judge Tamilia joined the majority opinion except on the issue of punitive damages, where he joined the President Judge.

egregious conduct in the qualitative sense, that is, the type of conduct to be sanctioned. Having rejected the "more egregious" rule, we find no basis for adopting the Post–Gazette's limitation of punishable conduct to actual knowledge of falsity and actual intent to harm. The "recklessness" components of both the actual malice and common law malice standards have always been considered sufficient indicia of the respective conduct sought to be sanctioned to serve the intended purposes.

However, this does not answer the question left open in *Geyer* as to what is to be the standard for allowing punitive damages in a defamation action where the plaintiff is a public official. If we embrace Judge Beck's conclusion that actual malice represents the type of conduct to be sanctioned by punitive damages in defamation actions, we must hold that a public official who proves actual malice to establish liability is automatically entitled to have the question of punitive damages considered by the jury, and end our discussion here. But, we are constrained to feel that, under these circumstances, common law malice better describes the conduct to be punished, and therefore we must continue our analysis.

As we noted earlier, Pennsylvania has adopted the guideline of Section 908(2) of the Restatement (Second) of Torts on the question of punitive damages in general, and has developed the requirement of common law malice around conduct which has variously been described as "outrageous," "malicious," "wanton," "reckless," "willful," "oppressive," the result of "bad motive," or "reckless indifference to the rights of others." *Feld v. Merriam,* 506 Pa. at 395, 485 A.2d at 747–748. Thus, when a defendant acts with common law malice, and thereby becomes susceptible to punitive damages, he does so with a necessary degree of evil volition toward the plaintiff. Stated differently, common law malice "focuses not on the nature or category of the tort, but rather on the defendant's disposition toward the plaintiff at the time of the wrongful act." Note,

*Punitive Damages and Libel Law*, 98 Harv.L.Rev. 847, 852 (1985).

Actual malice, on the other hand, focuses exclusively on the defendant's attitude toward the truth of the statement made, it being expressly understood that "ill will toward the plaintiff, or bad motives, are not elements of the actual malice standard." *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 52 n. 18, 91 S.Ct. 1811, 1824, n. 18, 29 L.Ed.2d 296 (1971) (plurality opinion); *Hepps*, 506 Pa. at 331, 485 A.2d at 388. The Supreme Court very recently reasserted this interpretation of actual malice in *Hustler Magazine v. Falwell*, — U.S. —, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), when it rejected the Court of Appeals for the Fourth Circuit's view that "the *New York Times* decision emphasized the constitutional importance not of the falsity of the statement or the defendant's disregard for the truth, but of the heightened level of culpability embodied in the requirement of 'knowing ... or reckless' conduct." *Id.* at —, 108 S.Ct. at 878–79. Chief Justice Rehnquist, joined by six justices, reiterated the consistent holding of the Court since *New York Times* was decided that actual malice, when applicable, is intended to ferret out deliberate or reckless falsehoods, not hatred or ill-will on the part of the speaker or writer. *Id.* at —, 108 S.Ct. at 879–81. Thus, the definition of actual malice is uniquely crafted to identify, in a constitutional context, what speech is to be protected and, conversely, what speech the states may regulate in the interest of protecting reputations through compensation. But punitive damages are not compensation; rather, they are awarded "to punish the wrongdoer and to deter both him and others from engaging in similar conduct in the future." *Delahanty v. First National Bank, N.A.*, 318 Pa.Super. at 129, 464 A.2d at 1263; Restatement (Second) of Torts § 908, comment a.

In *Geyer*, Judge Beck, explaining her preference for actual malice over common law malice as the standard for awarding punitive damages, reasoned that, "[a]lthough the 'ill will' component of common law malice clearly involves

conduct directly intended to harm the plaintiff, actual malice conduct is equally intentional with respect to the falsity of the publication," *Geyer*, 351 Pa.Super. at 563, 506 A.2d at 915–916, and that, because "[i]n its essence the law of libel is concerned with the harm which may be done to a citizen's reputation by the communication of false and defamatory statements, . . . [t]he wrongful act, . . . i.e. the act which causes the harm to the plaintiff, is therefore the publication of the libelous words, not the holding of a malevolent or spiteful attitude toward the plaintiff." *Id.*, 351 Pa.Superior Ct. at 564, 506 A.2d at 916. From this, she concluded that one cannot publish with actual malice and not also demonstrate at least the rudiments of common law malice, noting that "even if the immediate motive of the deliberate or reckless liar may not be to harm the plaintiff, he does at least have reason to know that harm may result from his conduct." *Id.*, 351 Pa.Superior Ct. at 564–565, 506 A.2d at 916.

The issue with punitive damages, however, is intentional harm, not intentional conduct which causes harm. While we do not dispute that publishing with actual malice often may be difficult to distinguish from publishing with an intent to harm, *see, e.g., Schiavone Construction Co. v. Time, Inc.*, 646 F.Supp. 1511, 1518 (D.N.J.1986) (finding no meaningful difference), we are not prepared at this time to say as a matter of law that no distinction exists. Because it is well settled in Pennsylvania that "the decision of whether to award punitive damages . . . [is] within the discretion of the fact finder," *Delahanty*, 318 Pa.Super. at 129, 464 A.2d at 1263, we feel it the better course to leave this determination to the jury under proper instructions.

Judge Beck further argued "that the actual malice standard better meets the goals behind the policy of deterrence . . . [because c]ourts and laws cannot realistically 'deter' someone from disliking or hating another . . . [but] the law can encourage a person to be more careful about what he says publicly about another, including the object of his ill will." *Geyer*, 351 Pa. Super. at 565, 506 A.2d at 916. This

conclusion, however, misapprehends the deterrent purpose of punitive damages. Although it is true that one cannot realistically be deterred from harboring feelings of ill will toward another, one can be deterred from acting on that ill will in such a way as to harm the other. This is precisely the deterrent objective of punitive damages.

As we recently observed, "[c]ourts in libel cases should be guided by the same general rules regarding damages that govern other types of tort recovery." *Agriss v. Roadway Express, Inc.*, 334 Pa.Super. 295, 329, 483 A.2d 456, 474 (1984) *allowance of appeal denied.*[23] Therefore, perceiving no reason to abandon the traditional requirement for a showing of actual or apparent ill will toward the plaintiff before allowing punitive damages, we hold that a public official, who must prove actual malice to establish liability in a defamation action, may not also recover punitive damages absent an additional finding that the defendant acted with common law malice in publishing the defamatory statement.

With this conclusion we do not join the debate whether actual malice or common law malice is "more evil," or whether punitive damages may be allowed only when the offending conduct is more egregious than that required to establish the underlying tort. Our holding today rests on the simple, but important, proposition that, in public official defamation actions, punitive damages are intended to punish and deter publication with actual or apparent ill will and, therefore, that the award of punitive damages must be limited to those cases where common law malice is shown.

On the issue of entitlement to punitive damages, the trial judge charged the jury as follows:

**23.** In a footnote to the above quoted passage, we added that "[o]f course, the First Amendment places outer limits on the recovery of punitive damages...." *Agriss,* 334 Pa.Super. at 329 n. 9, 483 A.2d at 474 n. 9. This editorial observation indicates both that we intended to include *punitive* damages within the scope of our comment, and that constitutional constraints are not to be viewed as exclusive limitations on such damages.

If you find by clear and convincing evidence that the conduct of the Defendant was outrageous, you may award punitive damages as well as compensatory damages in order to punish the Defendant for the conduct and to deter the Defendant and others from doing similar acts. A person's conduct is outrageous when he acts with a bad motive or when he acts with reckless indifference for the interests of others.

R.R. at 1745a. This charge tracks almost verbatim the Pennsylvania Selected Standard Jury Instruction (Civil) § 14.00—Punitive Damages (1984), which is based on the Restatement of Torts § 908(1) and which, as we have seen, is the law in Pennsylvania on punitive damages.[24] We therefore find no error on the part of the trial court in its presentation of this issue to the jury. Because the Post–Gazette does not challenge the sufficiency of the evidence under this standard, we may proceed to the final issue presented on this appeal.

## B. Excessiveness

The Post–Gazette finally avers that, even allowing that the jury properly considered the issue of punitive damages, the trial court failed to adequately limit those damages in accordance with constitutional mandates and state law principles. This failure, it argues, is manifest in both the court's charge to the jury and in its denial of a new trial or a remittitur of damages.

**24.** The standard of proof for punitive damages in Pennsylvania traditionally has been proof by a preponderance of the evidence. *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 173, 494 A.2d 1088, 1098 (1985). To the extent that the Post–Gazette would argue for a more rigorous standard, the *Martin* court observed, in the context of product liability litigation, that the goal of limiting punitive damage awards "is best served by focusing on the nature of the defendant's conduct instead of increasing the plaintiff's burden of persuasion." *Id.,* 508 Pa. at 173 n. 14, 494 A.2d at 1098 n. 14. However, we need not decide this question because the trial judge charged the jury that they could not award punitive damages unless they found "by clear and convincing evidence" that the conduct of the Post–Gazette was outrageous. The appellant cannot now complain of this.

### 1. *Jury Instructions*

 In making its argument that the Constitution requires the jury to be instructed on the necessity of limiting the amount of punitive awards to avoid intrusion on First Amendment freedoms, the Post–Gazette again relies heavily on the cautionary language of the Supreme Court in *Gertz, supra.* By transplanting the significance of that language from the argument behind limiting the availability of punitive damages to the argument here, however, the appellant is attempting to spend its constitutional currency in the wrong marketplace. Although much of what the court said about punitive damages in support of its holding in *Gertz* might appear relevant to a discussion on limiting amounts of punitive damages, that rhetoric cannot be proffered in support of a "constitutional" standard which is not related to the result achieved in that case.

In the punitive damages portion of the *Gertz* opinion, the Court first assessed the tension between the federal interest in free speech and the state interest in compensating for injury to reputation by noting that the state interest "extends no further than compensation for actual injury," *Gertz,* 418 U.S. at 349, 94 S.Ct. at 3011, and does not include "securing for plaintiffs ... gratuitous awards ... far in excess of any actual injury." *Id.* With this, the Court was drawing a line between its prior discussion of *liability* with respect to a private plaintiff (compelling state interest allows recovery if liability is based on a finding of fault) and its pending discussion of *punitive damages.* The point was that the same analysis used with respect to liability need not be applied to the issue of punitive damages.

Having justified the different treatment between liability for compensatory damages and liability for punitive damages, the Court explained its concern about punitive damages by noting that juries, free to "assess punitive damages in wholly unpredictable amounts, ... [might] use their discretion selectively to punish expressions of unpopular views ... [and thereby] unnecessarily exacerbate[ ] the danger of media self-censorship...." *Id.* at 350. To avoid

this eventuality, that is, to ensure that jury awards of punitive damages do not unconstitutionally infringe on free speech, the Court held that such damages should only be available where the plaintiff has been able to prove actual malice by clear and convincing evidence. It did not attempt to engraft onto the constitutional analysis, either explicitly or implicitly, any additional requirement as to limitations on the amount of punitive damages which may be awarded once actual malice has been proven. The Court itself has observed: "Our concern in *Gertz* was that the threat of punitive damages, *if not limited to especially egregious cases*, might 'inhibit the vigorous exercise of First Amendment freedoms.'" *Smith v. Wade*, 461 U.S. 30, 50, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983) (emphasis added). Thus, it was not any specific amount of punitive damages which threatened First Amendment freedoms. It was the unfettered imposition of such damages which concerned the Court, and it responded to protect those interests by imposing the fullest measure of constitutional protection it has ever afforded speech in this context, proof of actual malice.

Our analysis of *Gertz* is aided by a review of the Court's decision in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), handed down three years earlier. Although the principal issue in *Rosenbloom* was whether the actual malice standard should apply to the defamation of a private plaintiff on a matter of public concern (plurality said yes), two of the dissenting justices also discussed the proper standard for allowing punitive damages. Justice Harlan argued that, in a private plaintiff defamation case, the constitution is adequately protected where punitive damages are available only when "express malice" is shown, and the jury has been instructed that the amount of any award of punitive damages must "bear a reasonable and purposeful relationship to the actual harm done." *Id.* at 77, 91 S.Ct. at 1836 (Harlan, J., dissenting). Justice Marshall, expressing his own concern that jury discretion in making large punitive damage awards threatened free speech, would have "restrict[ed] damages to

actual losses," and not allowed punitive damages. *Id.* at 86, 91 S.Ct. at 1840 (Marshall, J., dissenting).

Thus, when the Court sought a majority position on similar issues in *Gertz*, it had these two blueprints before it on how to control the threat of punitive damages to constitutionally established rights. Although the *Gertz* majority borrowed extensively from the language of Justice Harlan's and Justice Marshall's dissents, it resolved the issue by rejecting their diametric plans and choosing an intermediate position. This position increased the ante on liability for punitive damages from Justice Harlan's position, but set no limits on amount, and lowered the threshold from Justice Marshall's position of no punitive damages to make it possible to recover such damages in the proper case.

Therefore, when the trial court correctly instructed the jury concerning the requirement for proof of actual malice in its charge on liability, *see* Section IB, *supra,* it also discharged its obligation to the Constitution on the questions of the availability of punitive damages, *see* Section III A, *supra,* and on the amount of such damages which may be awarded. The Post–Gazette's proposed points for charge on this issue were all drawn from the explanatory language of *Gertz,* and therefore were properly refused.[25]

**25.** The specific instructions which the appellant asserts it was error to deny read as follows:

The law has: "no substantial interest in securing for plaintiffs such as [the instant plaintiffs] gratuitous awards of money damages far in excess of any actual injury." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 at 349, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974);

and

Keep in mind that in considering an award of damages in this case, you are also faced with a balancing of values which are important in our society. On the one hand, the law has an interest in compensating plaintiffs for actual injury done to them by the wrongful, and nonprivileged act of the Press. However, on the other hand, in arriving at an award of damages, you must be careful not to go beyond fair compensation for the actual injury caused to the plaintiffs, since to do so would pose a threat to the legitimate interest of freedom of speech and of the press which are protected by the Constitution. *Gertz v. Robert Welch, Inc., supra;*

and

Finally, in considering whether or not to award punitive damages, as well as the amount of any award, you must again be mindful of

The Post–Gazette also urges that it is entitled to a new trial on damages, or a remittitur, because the trial court improperly charged the jury under Pennsylvania law. However, upon review of the trial record, we find that any challenge to the jury instructions on this basis is either without support in the law, or was waived. The two aspects of the court's charge which the appellant cites as inadequate include the failure to admonish the jury not to award excessive damages and the failure to instruct that any punitive award must bear a reasonable resemblance to the compensatory award.

On the first aspect, there can be no doubt that an award of punitive damages which is so excessive as to be an error of law will not be allowed to stand in this Commonwealth. *Daley v. John Wanamaker, Inc.*, 317 Pa.Super. 348, 353–354, 464 A.2d 355, 358 (1983). However, it is equally well settled that "the jury fixes the amount of such damages ... without yardstick, subject only to reduction by the court if deemed excessive under the circumstances of the particular case." *International Electronics Co. v. N.S.T. Metal Products Co., Inc.*, 370 Pa. 213, 225, 88 A.2d 40, 46 (1952); *see also, Rhoads v. Heberling*, 306 Pa.Super.

the balancing of values which is important in a case such as this. You are permitted to award punitive damages in accordance with the standards which I have given you. On the other hand, you must not award punitive damages unless you are certain that the appropriate legal standards have been met, and must be careful that the amount of any such award is not excessive in the light of the factors which are appropriate for your consideration. This is because imposing punitive damages in an improper case, or imposing excessive damages upon a defendant in a proper case, would pose a threat to the legitimate interests of freedom of speech and of the press which are protected by our Federal Constitution. *Gertz v. Robert Welch, Inc., supra.*

Brief for Appellant at 40–41. Clearly, such instructions could as easily have been denied for their form as for their substance. As it has been noted about a jury instruction, " '[a]t its best, it is simple, rugged communication from a trial judge to a jury of ordinary people....' " *Rosenbloom*, 403 U.S. at 85 n. 9, 91 S.Ct. at 1840 n. 9 (Marshall, J., dissenting). Justice Marshall appended this footnote to his discussion of Justice Harlan's suggestion that jurors be instructed to consider the broader impact of punitive damages and to relate them to actual injury.

35, 45, 451 A.2d 1378, 1383 (1982). Thus, the issue of excessiveness of a punitive damage award is not to be put to the jury in the form of an instruction; rather, it is reserved for the trial court, in the first instance, and the appellate court on review. Therefore, the trial court committed no error when it refused to charge the jury that any punitive damages it might award must not be excessive.

As to whether the punitive damages must bear a reasonable relationship to the awarded compensation,[26] we acknowledge that this is the law in Pennsylvania. *See Kirkbride v. Lisbon Contractors, Inc.*, 357 Pa.Super. 322, 516 A.2d 1 (1986) (en banc) (extensively addressing the question and concluding that, in spite of prior inconsistent precedent, a reasonable relationship must be required).[27] However, we are estopped from considering this alleged error in light of the appellant's failure to preserve the question for our consideration under Pa.R.C.P. 227.1(b).

**26.** In its reply brief, the Post–Gazette also asserts that it challenged the disproportionality of the punitive damages with respect to the evidence of actual injury. Reply Brief for Appellant at 22. In support of this contention, the appellant cites *Walder v. Lobel*, 339 Pa.Super. 203, 211, 488 A.2d 622, 626 (1985) (the "verdict [must] bear[ ] a reasonable resemblance to the damages proven"). To the extent that the Post–Gazette intended this to raise a separate issue from that of disproportionality with respect to the compensation awarded, we find it was waived for the same reasons we are about to discuss. However, we also note that the language relied upon from *Walder* was used in the context of compensatory damages and does not stand for the proposition that punitive damages must not be disproportionate to the proof of actual injury. This is evident from the fact that the *Walder* court relied on *Mohler v. Warley*, 179 Pa.Super. 56, 116 A.2d 342 (1955), which did not involve punitive damages.

**27.** While the law appears settled on this issue, it should be noted that the Pennsylvania Supreme Court Committee for Proposed Standard Jury Instructions has taken the opposite position, believing it is time to "depart[ ] ... from what may be considered as the existing Pennsylvania law on punitive damages." Pennsylvania Suggested Standard Jury Instruction (Civil) § 14.02, Subcommittee Note at 3 (1984). This is also the view of the Restatement (Second) of Torts § 908 (1979), and comment c thereto. Our supreme court has not expressly addressed its Committee's proposed jury instruction, although, in *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 173, 494 A.2d 1088, 1098 (1985) (Per Hutchinson, J., with one Justice concurring and four Justices concurring in the result), the reasonable relationship rule was noted as a restriction on the imposition of punitive damages.

*See* Section II, *supra.* Nowhere in the appellant's proposed points for charge, its supplemental proposed points for charge, or its second supplemental points for charge did the Post–Gazette request the trial court to instruct the jury that any punitive damages must be reasonably related to the compensatory damages.[28] Also, after the trial court charged the jury that "[t]he amount you assess as punitive damages need not bear any relation to the amount you choose to award as compensatory damages," R.R. at 1746a, the appellant did not object.

Therefore, the error must now be deemed waived, for, as we observed in *Sulecki v. Southeast National Bank,* 358 Pa.Super. 132, 516 A.2d 1217 (1986), the appellant's failure to object at the time the charge was given means that "[it] agreed to the court's instruction ... and ... will not now be allowed to complain that the jury followed the instructions of the trial court." *Id.,* 358 Pa.Superior Ct. at 137, 516 A.2d at 1220. *Sulecki* also teaches that where review of the "reasonable relationship" charge has been waived, the appellant may not then assert the disproportionality of the punitive and compensatory awards as part of its argument that the punitive damages are excessive. *Id.* ("No matter what language it chooses to express itself, defendant cannot alter the fact that it has waived this issue and we will not consider it.")

### 2. *Excessiveness of the Award*

Thus, we are left with the Post–Gazette's argument that the trial court erred in failing to grant a new trial or to remit the damages where the punitive damage award was excessive in light of the evidence produced at trial. In

**28.** Proposed charge number 66 does draw from *Laniecki v. Polish Army Veterans Association,* 331 Pa.Super. 413, 423, 480 A.2d 1101, 1106 (1984) to the effect that "a claim 'for punitive damages cannot stand on its own ... "and you may not make any award of punitive damages" where actual damages have not been suffered by the [plaintiffs]....' " R.R. at 1814a. However, this request, refused by the trial court, does not meet the requirements of Rule 227.1(b) in that it raises an issue substantially different from that raised here. In addition, because compensatory damages were awarded, the appellant cannot now claim that it was prejudiced by the trial court's failure to give this charge.

*Delahanty v. First National Bank, supra,* we found it to be well settled that "the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the factfinder . . . [such that, a]lthough . . . not a favorite of the law, . . . they will only be reduced on appeal if the reviewing court determines that they are excessive under the facts of the individual case." *Delahanty,* 318 Pa.Super. at 129, 464 A.2d at 1263 (citations omitted). In *Walder v. Lobel, supra,* we added that "the jury's award of punitive damages should not be disturbed by the court 'unless it is so grossly excessive as to offend the conscience of the court and to shock its sense of justice.'" *Walder,* 339 Pa.Super. at 211, 488 A.2d at 626 (citation omitted). Excessiveness may be indicated when the award of these damages is "so large as to indicate that the jury was influenced by passion or prejudice," *Feld v. Merriam,* 314 Pa.Super. 414, 437, 461 A.2d 225, 237 (1983), *rev'd on other grounds,* 506 Pa. 383, 485 A.2d 742 (1985), or when it " 'clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence.' " *Walder,* 339 Pa.Super. at 211, 488 A.2d at 626 (citation omitted).

In deciding whether the trial court erred in refusing to grant a new trial or to remit damages on the ground of excessiveness, we observe that that decision "is peculiarly within the discretion of the trial court, and will not be interfered with on appeal unless the record discloses a clear abuse thereof." *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 472–473, 273 A.2d 899, 919 (1971). In exercising this discretion, however, the trial court is not free to "declare an award excessive simply because it might have awarded a lesser amount sitting in place of the jury." *Sulecki,* 358 Pa.Super. at 138, 516 A.2d at 1220. Similarly, we may not find an abuse of discretion on the part of the trial judge simply because we would have awarded a different amount. *Walder,* 339 Pa.Super. at 212, 488 A.2d at 627 (trial court's abuse of discretion not just an error of judgment).

■ The trial court charged the jury that in fixing the amount of punitive damages it chooses to award, if any, it may consider any and all of the following factors: The character of the Defendant's acts, the nature and extent of the harm to the Plaintiff which the Defendant caused or intended to cause, the wealth of the Defendant insofar as it is relevant in fixing an amount which will punish it and deter it and others from similar conduct in the future.... The amount of punitive damages awarded must not be the result of passion or prejudice against the Defendant on the part of the Jury. The sole purpose of punitive damages and the only purpose for which you may make an award and set an award of punitive damages is to punish the Defendant's outrageous conduct and to deter the Defendant and others from the commission of similar acts.

R.R. at 1745a–1746a (the omitted material concerned the "reasonable relationship" portion of the charge discussed *supra*). This charge, drawn from the Pennsylvania Suggested Standard Jury Instruction (Civil) § 14.02 (1984), extracts those portions relevant to the instant action. Although the suggested instruction remains unadopted by our supreme court, *see Kirkbride*, 357 Pa.Super. at 325, 516 A.2d at 3, the elements included in the trial court's tailored charge are undisputedly consistent with our caselaw. *See Feld v. Merriam*, 506 Pa. at 395, 485 A.2d at 748 (look to the act and all circumstances, including motive and relations between the parties); *Pierce v. Penman*, 357 Pa.Super. 225, 237, 515 A.2d 948, 954 (1986) *allocatur denied*, 515 Pa. 608, 529 A.2d 1082 (1987) (jury has broad discretion in assessing amount of punitive damages to effectuate punitive and deterrent function); *Sulecki*, 358 Pa.Super. at 138, 516 A.2d at 1220 (look to nature of conduct and purpose of award); *Dean Witter Reynolds, Inc. v. Genteel*, 346 Pa.Super. 336, 347, 499 A.2d 637, 642 (1985) *allocatur denied*, 514 Pa. 639, 523 A.2d 346 (1987) (quoting with approval Section 908(2) of the Restatement, which is the basis for the charge given); *Hoffman v. Memorial Osteopathic Hospital*, 342 Pa.Super. 375, 385, 492 A.2d 1382, 1388 (1985) (defendant's wealth is

relevant to set punitive damages). Having correctly charged the jury, we now look to see whether the trial judge abused his discretion in upholding the jury award of punitive damages.

We conclude that Judge Mihalich's thorough analysis of this issue reveals sufficient grounds in all of the above stated categories to require an affirmance of the award in light of the standard of review stated above. In making this determination, we are mindful that, before even considering this issue, the jury had already determined that the published material was false, and that the Post–Gazette published it with actual malice and with at least a reckless indifference to the rights of Richard DiSalle.

In his opinion, the trial judge considered the nature of the newspaper's conduct and its apparent motive by observing that

the Defendant's actions evidenced a particular disregard for its responsibilities as a major news gathering and conveying source. Far from attempting to report dispassionately on a dispute which had ripened into a protract[ed] legal proceeding, the purpose of the *Post–Gazette* was to sensationalize this bitter family controversy by lurid suggestions of fraud and sexual impropriety by a man whose reputation was above reproach. It is not simply that the article prepared by the *Post–Gazette* was replete with inaccuracies; it was more that the editors in charge of the preparation of the article found it necessary to insert an unfounded and sensational element to fill a "hole" in the story. Rather than reporting accurately that this "hole" was not even of prime consideration to counsel for the contestants, the *Post–Gazette* highlighted it in such a way as to leave the natural impression on the part of the reader that a serious question of Mr. DiSalle's competence and integrity had been entertained in a court of law.

Trial Court Opinion at 30–31.

From our own review of the record, we find that these conclusions are amply supported by the evidence, and we

agree with the significance attributed to this conduct. In *Frisk v. News Co., supra,* it was determined that evidence of an "extreme departure from acceptable journalistic practices" may form the basis for an award of punitive damages. *Frisk,* 361 Pa.Super. at 549, 523 A.2d at 353. Conversely, in *Sulecki, supra,* this court upheld a trial court's remittitur of an award of punitive damages against the Bank on the grounds that the defamation was the result of the personal hostility of one of the Bank's employees acting on his own, although within the scope of his employment. Adopting the reasoning of the trial court, we held the reduction proper in light of the isolated conduct of the employee. *Sulecki,* 358 Pa.Super. at 139, 516 A.2d at 1221. *See also, Dean Witter, supra,* 346 Pa.Superior Ct. at 348, 499 A.2d at 643 (award upheld where punitive damages imposed based on conduct of more than just a single agent). Instantly, the trial judge noted the combined efforts of the Post–Gazette's editorial staff to fill a "hole" in the story, not just one employee acting on a personal grudge. There being ample evidence in the record to support this, we do not find that the trial judge abused his discretion in upholding the punitive damages awarded by the jury.

As to the circumstances surrounding the publication of the article, the trial judge noted:

> This article was not the report of a fast-breaking news story in which time for reflection and thought on the part of the newspaper was out-weighed by the need to quickly and properly report the essence of the facts to the public. This article had been prepared over a substantial period of time and the selection of the material to be placed in the article was done with discretion and premeditation by the officials of the newspaper.

Trial Court Opinion at 34. Again, we find this conclusion consistent with the evidence adduced at trial and logically related to the jury award, and therefore cannot say that the trial court abused its discretion.

Finally, the trial court considered the evidence presented at trial tending to show the wealth of the Post–Gazette and

its ability to pay an award of punitive damages, and the extent of the harm caused to DiSalle as a result of the defamatory publication. Although there was no evidence available relating the precise "book" value of the Post–Gazette at the time of trial, the testimony of one of the newspaper's financial officers made it evident that the award of $2,000,000.00 in punitive damages, albeit large, was not so large as to suggest that the jury was motivated by either passion or prejudice. Rather, in light of all that has been discussed, it is apparent that the jury was reacting to the grossly cavalier attitude toward the sensitivities and reputation of a prominent member of the community by a major publishing force in the region.

The jury responded to the court's charge that the only purpose for awarding punitive damages is to punish and deter by setting an amount equal to that goal. The feeling which produced this jury award was an anger appropriate to the Post–Gazette's callousness, and, as this attitude was amply proven in the courtroom, we do not find that the trial judge abused his discretion in letting it stand.

## IV

## CONCLUSION

With this appeal, the Post–Gazette asks us to strike an unprecedented balance between two long-standing traditions which, for most of our history, traveled parallel courses without conflict. Our constitutional tradition of jealously guaranteeing free speech was not seen to overlap with the even older tradition of protecting a man's honor and reputation from false comment because defamation was considered unworthy of constitutional protection; it was false by definition and therefore of no value to a form of government dependant on the free exchange of information.

Recently, the Supreme Court recognized that the essence of our national commitment to free speech is the principal that public debate must be allowed to be uninhibited and robust, even vehement and sometimes unpleasantly sharp

and, because erroneous statements are inevitable in such a setting, even they must be protected to give free expression the breathing space it needs to survive. Therefore, the definition of false speech was refined in order to better protect free speech. The line separating protected false speech from that false speech which would remain outside the constitutional pale was drawn between the speaker who knew or recklessly disregarded the fact that the speech was false, and the one who misspoke without this new "actual malice." The former was left to the mercies of state defamation law while the latter was shrouded with the cloak of the First Amendment and protected from the assessment of damages for his injurious misstatement.

Actual malice became the Supreme Court's defamation cursor, to be placed on the screen before it at the point where the interests sought to be protected by the First Amendment take precedence over the individual interests embodied in state defamation law. Thus, public officials and public figures find themselves separated from recovery in defamation by the cursor, but private plaintiffs do not. While the position of the cursor has not been static, the degree of protection which follows it has remained virtually unchanged over the score of years which have passed since its adoption and the many score of cases which have called for its application.

The Post–Gazette seeks to enlarge, rather than relocate, this protection by making knowledge or reckless disregard of falsity irrelevant to the issue of liability, and actual knowledge of falsity a prerequisite to the recovery of punitive damages. This we will not do under the circumstances presented here. Actual malice, though not without its detractors, has served its purpose by according protection only to those who do not publish with knowledge of or intentional blindness to the truth, and therefore whose actions serve the objectives of robust debate. All others, who act in disregard for the truth and therefore contribute nothing, are properly forced to take their chances in the same free marketplace of ideas which they have sought to

abuse. The facts of this case do not recommend to us the need to lessen the risks taken by the latter category of defendants.

MONTGOMERY, J., dissents.

## APPENDIX

### FEUD HEATS IN FAMILY'S BATTLE FOR $8 MILLION INHERITANCE

By THOMAS J. PORTER, JR.

Post–Gazette Staff Writer

Paul Ciaffoni, a Washington County self-made man who amassed a fortune in real estate, died at the age of 79 in 1974. But since then the sweet wine of success that his family enjoyed has turned sour.

For five years, the family has been bitterly divided over disposition of Ciaffoni's $8 million worth of assets. Allegations of fraud abound.

On one side is the widow, Concetta, now residing in Tucson, Ariz; his youngest son, Robert of Canonsburg, Washington County; the oldest son, Orlando of Brentwood, the oldest daughter, Margaret Soviero of Peters Township, Washington County, and their children.

On the other side are four daughters, Elizabeth Cowden of Cecil Township, Washington County; Virginia Messa of Philadelphia; Pauline Myers of New Jersey; Lorrayne Erikson of Birmingham, Ala.; and their children.

So bitter has been the fight among them that some members of the family won't accept the riches to which they are entitled until the situation is resolved.

That resolution has been the subject of lengthy court disputes, involving a Commonwealth Court judge, a U.S. District judge and famed Philadelphia lawyer Richard Sprague.

It is a situation Ciaffoni could never have imagined occurring when he packed up his few belongings at the advent of

World War I and left his native Italy to seek his fortune in the United States. He settled in Washington County and eventually, through years of hard work and shrewd business dealings, became a property owner of considerable means.

In happier times, the family worked together under the leadership of the husky patriarch.

But at his death the harmony ended over the estate that includes thousands of acres of rolling farmlands, hundreds of head of cattle, oil, gas and coal, real estate in seven states, and a chain of leased supermarket buildings.

A chief contestant of the will and a co-executor, Robert Ciaffoni, charges that the gut issue of the family feud centers on fraud:

"We're not arguing acreage. This will is a fraud. It is not my father's will. It is not in keeping with my father's policy of keeping peace in the family," he said.

Robert and his mother, who together would gain the most from the will, are the primary contestants, and have taken the side of Mrs. Soviero, who would receive nothing.

"I renounce this will as a matter of honor. We were once a happy family. This fraud has ripped out the moral and financial heart of my family," Robert declared.

He charges that the will was falsified to the benefit of his youngest sister, Elizabeth Cowden, and in a request for an injunction filed in the Washington County courthouse, he names as co-conspirators her and Commonwealth Court Judge Richard DiSalle who prepared the will in 1968 as an attorney.

The injunction request asks that Mrs. Cowden not be permitted to "exercise the rights of and powers of a co-executor of the family fortune" because as a co-conspirator in a fraud she could "invite recrimination against those who have charged her with fraud."

In February, visiting Judge Earl F. Keim of Westmoreland County who heard the case in Washington County, upheld the authenticity of the will and ruled as inadmissible

claims by experts hired by the contestants that portions of the will were altered.

Keim, however, reserved the right to change his decision pending the filing of briefs by attorneys for each side. Those briefs have now been filed and Keim is expected to make a final ruling soon.

The opponents of the will have vowed to take the case to the state Supreme Court if they lose.

The will provides Mrs. Cowden with the family's 400–acre homestead and the estate's largest food store on West Liberty Avenue, Brookline Junction, with an estimated monthly rental value of $6,000.

She did not receive the homestead or the food store, which was an A & P supermarket in Brookline Junction, in a 1965 will that the proponents claim is their father's real will.

However, she did receive several valuable tracts of land and an A & P store in Sewickley.

"She was well provided for in my father's real will," Robert said. "At that time we had a great amount of respect and love for Elizabeth. She was the baby of the family."

"But, it was always my father's intention to have the family homestead and lands close in to remain in the Ciaffoni name. He wanted his name to live on in this area after his death. That's the way he was."

Robert said the family homestead, purchased in the 1930s was the "roots and moral substance of the Ciaffoni family."

"It's where the grandchildren came to stay in the summer, Christmas and other family gatherings. We worked that land with our hearts and hands. We plowed it, made hay on it, and raised thousands of head of cattle," he said.

"My father would never have let it go out of the family to someone Elizabeth married."

Robert cites a U.S. Postal Service inspector's report, entered in evidence at an earlier hearing last year, that the

will's controversial second page "appeared inconsistent" with the other pages.

The examination of the will was ordered by Washington County Judge Paul Simmon, who dismissed himself from the case when nominated to a U.S. District Court judgeship, but was limited to a "survey and review of superficial physical aspects."

The state Supreme Court then appointed Keim to the case and a trial was held last September.

In a subsequent brief filed by J. Brook Aker, the attorney representing the widow's side of the family, he claimed that the court erred in not permitting testimony of experts hired by the opponents proving the will is a fraud.

Robert said the portion of the will assigning Elizabeth the Brookline Junction property was referred to as Pittsburgh 19 and charges that if DiSalle prepared the will, as he testified he did, he would have known that Pittsburgh 19 is in the Uptown—"the legal hub of Allegheny County."

Robert further charges that for security reasons Richard DiSalle never let an inside page of a will begin or end with a sentence or paragraph. Yet two pages in the questioned will did.

When questioned on this point during a recent interview, DiSalle, who this spring lost a primary election bid for renomination, said:

"I can't comment. The case is under appeal."

Robert also said pages before and after the page leaving Elizabeth her legacy where doctored to permit the new entry.

"It's as if someone were trying to meet some sort of internal deadline to get something else in," Robert said.

He said that when DiSalle prepared the will DiSalle and Elizabeth were close friends.

In a deposition prepared by Richard Sprague, attorney for proponents of the will, and entered in the court record

of the case, Sprague questioned Robert about the relationship between DiSalle and his sister Elizabeth.

Sprague asked Robert in the deposition:

"Now you tell me what has been told to you by other people which to you is an indication of sexual intimacy between Richard DiSalle and Elizabeth Cowden?"

Robert replied.

"I'm sorry, your misstating my position. I said they were by themselves for extended periods of time and were observed by other people and that it could develop into that. That's all I am telling you."

When contacted, Mrs. Cowden declined to comment on any aspect of the case, referring all questions to her attorney, Robert Ceisler.

Ceisler said, "I don't think this is the appropriate time to discuss this case. Briefs have been filed by both sides and we are awaiting the decision from Judge Keim."

In another deposition taken by Sprague, he questioned the widow, Concetta, about a conversation she had with her husband shortly before his death in which she asked her husband if he knew that Elizabeth was getting the family homestead and the Brookline Junction property.

According to the deposition, Ciaffoni's reply to his wife was:

"No, sir. I did not sign. Call her right now."

She said he then "screamed at me. I thought he was going to take a heart attack.

"I said, 'No, you wait till you get better,' and he quieted down and that was the conversation we had.

"That's when I wanted specifically—I felt that he did not know, cause he couldn't see or hear to good."

The questioned will leaves nothing to the older daughter, Margaret Soviero.

Mrs. Soviero, a widow, with three college age children, is director of the Reading Academy of the Community College

of Allegheny County and is working on her doctorate degree.

In the 1965 will she received approximately 500 acres in North Fayette Township near Greater Pittsburgh Airport. That property now goes to two sons of a younger sister, Virginia Messa.

She admitted that there were bad feelings between her and Virginia and that Elizabeth sided with Virginia.

"Being the oldest sister in a large family and having to dispense punishment to younger sisters in the absence of my mother and father at times wasn't a job I relished anymore than they did," Mrs. Soviero said. "But the worse thing I ever remembered doing was hitting Elizabeth over the head with a spaghetti fork.

"This cannot be my father's will. He would not have done this to me. It would have been an unnatural thing for him to do."

Robert claims Elizabeth has been instructed by her attorney not to speak to her mother.

"My mother is very hurt," Robert said.

Meanwhile the two sides of the family remain estranged.

"I can't speak for everyone," Robert said. "But the family will never be the same. Personally, I no longer speak or have anything to do with the other side.

"I tried to make peace once through my sister Lorrayne in Alabama and after a 4–hour phone conversation she told me, 'I know it's not Daddy's will, but you prove it.' We were once an open family with nothing to hide from each other ... Our energies have been wasted on this thing."

MONTGOMERY, Judge, dissenting:

I respectfully dissent, solely upon the issue of excessiveness of the $2 million punitive damage award which was upheld by the Majority in this case. This award, in my view, shocks the conscience, and should not be affirmed.

Punitive damage awards may be reduced by a trial judge, or may be reduced on appeal if the reviewing court determines that they are excessive under the facts of the individual case. See *Delehanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243 (1983). However, I would prefer to grant a new trial in circumstances such as those presented in this case because I am convinced that due process is offended unless the issues of compensatory and punitive damages are presented to the jury in a bifurcated manner. The jury should first deliberate the issue of what compensatory damages, if any, are to be awarded to the plaintiff. Only after the verdict has been rendered on that issue should the jury be permitted to consider the question of punitive damages.

Justice O'Connor has articulated well several concerns I share regarding a denial of due process in a punitive damage procedure such as that followed in the courts of our Commonwealth, in which there are no real limits or structure. See Justice O'Connor's recent Concurring Opinion on this issue, in *Bankers Life and Casualty Company v. Crenshaw*, — U.S. —, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988). The bifurcation of the compensatory and punitive damage stages of a case, in my opinion, is one essential requirement to avoid offending due process standards. Such a bifurcated procedure is followed in other jurisdictions. See the excellent study and commentary on this point, and on punitive damage procedure generally, in Wheeler, *The Constitutional Case for Reforming Punitive Damages Procedure*, 69 Va.L.Rev. 269 (1983).

I believe that the compensatory damages which were awarded in this case were clearly affected by the presentation of evidence of the wealth of the Defendant, in connection with the jury's consideration of the punitive damage issue at the same time. On this point, see *Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742 (1984). Thus, a retrial of the compensatory damage issue is warranted. This result could have been avoided by a bifurcation procedure, such as that

580

followed in other jurisdictions. I urge the adoption of such a practice in our Commonwealth.